**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| TAUNO WAIDLA, | Nos. 18-99001 |
| | 18-99002 |
| *Petitioner-Appellee / Cross-Appellant*, | |
| | D.C. No. 2:01-cv-00650-AG |
| v. | |
| RONALD DAVIS, Warden, | |
| | OPINION |
| *Respondent-Appellant / Cross-Appellee.* | |

Appeals from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted March 1, 2023
Reargued and Submitted January 25, 2024
Pasadena, California

Filed December 23, 2024

Before: Kim McLane Wardlaw, Morgan B. Christen, and
Eric D. Miller, Circuit Judges. [*]

---

[*] The Honorable Paul J. Watford retired from the Ninth Circuit Court of
Appeals on May 31, 2023. Judge Morgan B. Christen was drawn to

Per Curiam Opinion;
Concurrence by Judge Christen;
Partial Dissent by Judge Wardlaw

## SUMMARY**

### Habeas Corpus / Death Penalty

In the State of California's appeal and Tauno Waidla's cross-appeal from the district court's judgment on Waidla's habeas corpus petition challenging his California conviction and death sentence for a 1988 murder, the panel affirmed the district court's denial of guilt-phase relief and reversed the district court's grant of penalty-phase relief.

Waidla cross-appealed the district court denial of relief on his two claims of guilt-phase error. Reviewing under 28 U.S.C. § 2254(d), the panel agreed with the district court's assessment that Waidla's claims lack merit.

Waidla contended that his Fifth Amendment rights were violated when the State introduced his confession at trial. The trial court ruled that Waidla's confession and pre-trial statements to the police were admissible because it found that, although Waidla had invoked his right to counsel, he later initiated dialogue with a detective. The California Supreme Court relied on *Edwards v. Arizona*, 451 U.S. 477

---

replace him on July 17, 2023 (Dkt. 94) while the Petition for Rehearing was pending. Judge Christen asked for oral argument and this appeal was reargued on January 25, 2024.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

(1981), to conclude that, as a matter of law, Waidla's question to a detective amounted to initiation of interrogation that constituted waiver of *Miranda*. The panel held that the California Supreme Court did not unreasonably apply *Edwards* and its progeny when it upheld the admission of Waidla's pre-trial statements and confession, as fairminded jurists could conclude that law enforcement did not recommence interrogation in the sense relevant to the *Edwards* analysis.

Waidla contended that counsel rendered ineffective assistance in four areas at the guilt phase: (1) investigating and litigating the motion to suppress Waidla's confession; (2) counseling Waidla to recant his confession and testify to an alibi; (3) failing to investigate alternative defenses; and (4) failing to rebut the State's expert testimony regarding the lifespan of fingerprints. The panel concluded that, as to the first and second alleged deficiencies, the California Supreme Court reasonably could have concluded that counsel met the performance standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); and that the remaining alleged deficiencies did not prejudice Waidla.

The State appealed the district court's order granting penalty-phase relief on Waidla's claim that his counsel rendered ineffective assistance by failing to investigate and present mitigation evidence that competent counsel would have discovered. Not reaching *Strickland*'s performance prong, the panel concluded, under the Antiterrorism and Effective Death Penalty Act, that the California Supreme Court's conclusion that Waidla was not prejudiced by his counsel's alleged errors was not unreasonable.

As alternative grounds for affirming the district court's order granting penalty-phase relief, Waidla argued (1) that

the prosecutor violated his Eighth Amendment right to heightened reliability in capital sentencing by presenting inconsistent factual theories at the seriatim trials of Waidla and his codefendant, and (2) that prosecutorial misconduct denied him his right to due process and a fair trial in violation of the Fourteenth Amendment. The panel concluded (1) the district court correctly observed that there is no clearly established Supreme Court precedent prohibiting a prosecutor from presenting inconsistent theories to convict codefendants in separate trials, and (2) whether the alleged prosecutorial misconduct is considered under the Eighth Amendment or the Fourteenth Amendment, the claim fails because the California Supreme Court's factual findings were not unreasonable.

Judge Christen concurred. She concluded that the California Supreme Court's prejudice analysis was not unreasonable, but also concluded that some aspects of Waidla's counsel's performance fell below an objectively reasonable standard. She wrote separately to avoid minimizing the requirement that counsel investigate a capital defendant's available options before deciding not to pursue them.

Judge Wardlaw dissented in part. She concurred in the portion of the judgment denying habeas relief from Waidla's conviction, but would affirm the district court's grant of habeas relief to Waidla on his penalty phase ineffective assistance of counsel claim because she believes counsel performed deficiently during the penalty phase and that this deficient performance prejudiced Waidla.

**COUNSEL**

Marta VanLandingham (argued), Tracy Casadio, Craig A. Harbaugh, and Katherine Farkas, Deputy Federal Public Defenders; Cuauhtemoc Ortega, Federal Public Defender; Federal Public Defender's Office, Los Angeles, California; for Petitioner-Appellee.

Seth P. McCutcheon (argued), Scott Hayward, and Michael C. Keller, Deputy Attorneys General; Dana M. Ali, Supervising Deputy Attorney General; James W. Bilderback II, Senior Assistant Attorney General; Lance E. Winters, Chief Assistant Attorney General; Xavier Becerra, Former Attorney General; Rob Bonta, Attorney General; Office of the California Attorney General, Los Angeles, California; for Respondent-Appellant.

**OPINION**

PER CURIAM:

A California jury sentenced Tauno Waidla to death for the 1988 murder of Viivi Piirisild. Among other findings, the jury convicted Waidla of first-degree murder with two special circumstances: murder during the commission of a robbery and murder during the commission of a burglary. Viivi was murdered in her home, having sustained multiple blows to her head with a hatchet. The blows crushed her skull and fractured her jaw, larynx and hyoid bone. She was also stabbed multiple times. The State argued that Waidla acted with an accomplice, but the two men were tried separately. The jury in Waidla's trial found that he personally used a hatchet.

The California Supreme Court affirmed Waidla's convictions on direct appeal, *People v. Waidla*, 996 P.2d 46 (Cal. 2000), and the United States Supreme Court denied his petition for a writ of certiorari, *Waidla v. California*, 531 U.S. 1018 (2000). This appeal arises from the district court's decision granting penalty-phase relief on Waidla's petition for a writ of habeas corpus. The State has appealed that decision and Waidla cross-appealed the denial of guilt-phase relief.[1] We affirm in part and reverse in part.[2]

## I.  Background

### A

Tauno Waidla was born and raised in Estonia during its occupation by the Soviet Union. In 1986, when Waidla was 18 years old, he was conscripted into the Soviet Army, an institution known for mistreating Estonian soldiers. *Id*. at 54. While stationed in East Germany, Waidla escaped into West Germany with a fellow Estonian, Peter Sakarias. From there, Waidla and Sakarias sought and received asylum in the United States in 1987. *Id.*

Upon arriving in New York, Waidla and Sakarias were received warmly by the Estonian émigré community. *Id.* In April 1987, Waidla moved to Los Angeles, where he met Avo and Viivi Piirisild. The Piirisilds had relocated to the

---

[1] The opinion filed on May 23, 2023, (Dkt. 85) is hereby ordered **VACATED**. The Warden's Petition for Panel Rehearing (Dkt. 92) is **DENIED** as moot. The parties may seek panel rehearing or rehearing en banc from this opinion.

[2] Judge Christen and Judge Miller join the per curiam opinion in full. Judge Wardlaw concurs in the portion of the judgment denying the guilt phase claims and dissents from the judgment as to the penalty phase ineffective assistance of counsel claim.

United States from Estonia decades earlier and were active members of the Baltic American Freedom League, an organization devoted to fighting for the Baltic States' independence from the Soviet Union. *Id.* The Piirisilds invited Waidla to live with them shortly after meeting him. He moved in and lived with the Piirisilds for just over a year, and they paid for his food, cigarettes, clothes, and medical care. *Id*. at 54. They also offered to help him find employment. *Id.* Waidla applied for a radio broadcasting job and accepted occasional short-term jobs, but he was otherwise uninterested in finding work or returning to school. *Id.*

The Piirisilds asked Waidla to help them renovate their home in exchange for his room and board. *Id.* at 54–55. Waidla agreed and completed several significant projects. *Id.* at 55. At some point, Viivi indicated that Waidla could have the Piirisilds' non-functioning car if he started to attend school or obtained a job. *Id.* Later, she promised him the car for finishing certain home improvement projects.

Waidla sought to collect on Viivi's promise in May 1988, claiming that he was owed for the work he had done on the house. *Id.* Viivi refused, in part because Waidla showed little initiative to work or attend school. *Id.* Waidla became angry and threatened to report the Piirisilds for building without a permit. *Id.* He also threatened to kill Avo and to break his arm. *Id.* at 56. Viivi told him to pack and leave. *Id*. Rita Hughes, the Piirisilds' daughter, was able to calm Waidla down and help him pack, after which he left peacefully. *Id*.

Waidla began traveling with Sakarias across the country by car. While in Arizona, they sent Viivi a postcard featuring a recipe for skinning, cutting up, and cooking

rattlesnake, on which they wrote: "You are as wise as the rattlesnake." Waidla also called the Piirisilds from the road several times to ask for the car or the proceeds from its sale. *Id.* During this period, Viivi expressed fear of Waidla and Sakarias to several people, including her acquaintance George Charon, a Federal Bureau of Investigation agent. *Id.*

Waidla and Sakarias eventually made their way to Boston, where Sakarias accepted a job to deliver a pickup truck to San Francisco. *Id.* The two drove to Los Angeles on their way to San Francisco. *Id.* On July 4, 1988, they went to the Piirisilds' home to ask again for the car. *Id.* Avo told them that he was unable to get the car's title from the bank due to the holiday and that he would be leaving town the next day. Avo said that he would be gone for two weeks. Waidla and Sakarias went on their way after Avo bought gas for the pickup. *Id.* At some point, the two drove to the Piirisilds' cabin in Crestline, California, which Waidla had previously visited as the Piirisilds' guest. *Id.* at 54, 56. They stayed there without permission for over a week, eating the Piirisilds' food and making calls. When they left, they took a hatchet and various other possessions. *Id.* at 56.

On July 12, the Piirisilds' neighbor saw two men that he later identified as Waidla and Sakarias walking toward the Piirisilds' home wearing jackets and carrying no bags. *Id.* at 56–57. When he saw them leave later, they carried bags and no longer wore jackets. *Id.* at 57. On July 14, a friend checked on the Piirisilds' house at Avo's request because Avo had not been able to reach Viivi. The friend found that the kitchen door had been broken to allow entry. Viivi was dead inside a bedroom. *Id.* at 57.

The crime scene showed that Viivi was attacked as she walked through the front door of the house and that her body

was later moved from the entryway to a bedroom, where it was covered with a bedsheet. *Id.* at 57. Viivi sustained multiple wounds to the head consistent with blows from the blunt side of a hatchet. *Id.* As a result, all of the bones on one side of her face were broken. Viivi also had been stabbed four times in the chest and suffered three head wounds caused by the sharp edge of a hatchet. *Id.* One of the sharp-edged hatchet blows, which was inflicted pre-mortem, was so forceful that it cut through the top of her skull and left a flap of bone attached only by scalp tissue. The others, which had been inflicted post-mortem, left incisions on her forehead. *Id.* While she was alive, she also suffered a broken voice box that may have been caused by strangulation. The medical examiner, Dr. James Ribe, also testified that post-mortem abrasions he observed on Viivi's back could have been caused by dragging her body from the entryway to the bedroom. The official cause of death was the combined effect of the bludgeoning, stabbing, chopping wounds and strangulation. *Id.* Dr. Ribe found no evidence of defensive wounds.

Police found only seven fingerprints at the residence. One, on the deadbolt cover of the kitchen door—the door that had been broken to allow entry—was a match for Waidla. *Id.* Police also obtained saliva samples from two cigarette butts found in the trash that matched Waidla's, but not Sakarias's, blood type. *Id.*

On July 12, Waidla and Sakarias pawned two pieces of Viivi's jewelry and purchased two plane tickets to New York using Viivi's credit card. *Id.* While in New York, they stayed with an Estonian acquaintance, Andres Juriado. Juriado raised the news of Viivi's murder, but Waidla and Sakarias changed the subject rather than engage on the topic. *Id.*

On August 28, Waidla was arrested by United States Border Patrol in New York near the United States-Canada border on suspicion of illegal entry. *Id.* He carried a loaded gun in a backpack as well as an unsent letter to Sakarias. The letter suggested that Waidla had considered suicide. He also wrote: "When you hear that I am dead, then you should know that I've [croaked] with a weapon in hand. If you hear that I have been taken alive . . . (almost impossible) . . . then you should know that I did my best." *Id.* at 58.

While in custody in New York, Waidla initially invoked his right to counsel during interrogation by a Border Patrol agent. *Id.* at 69. However, he made incriminating statements to Los Angeles Police Department ("LAPD") Detective Victor Pietrantoni the next day at a jail facility in Rouses Point, New York. *Id.* at 69–70. When he talked to Detective Pietrantoni, Waidla initially denied any role in Viivi's murder, telling Pietrantoni that he had parted ways with Sakarias after leaving the Piirisilds' cabin in Crestline and that he returned to Los Angeles on July 9, and then hitchhiked alone to New York where he met up with Sakarias. Waidla also stated that he last saw Viivi on May 21 and Avo on July 5. After Detective Pietrantoni confronted Waidla with information that an eyewitness identified him and Sakarias leaving the Piirisilds' house on July 12, Waidla admitted to being in the house that morning. He stated that he and Sakarias had entered through the rear door by breaking the glass and unscrewing the dead bolt. He recounted that he ran outside when he saw Viivi pull up and that he heard a struggle during which Viivi said, "don't hit." Waidla said that he saw Sakarias hit Viivi with a hammer that they had taken from the Crestline cabin. He described the hammer as blunt on one end and with a blade on the

other.  Waidla stated that when he re-entered the house, he saw blood and left.

Detective Pietrantoni then told Waidla that police had recovered his fingerprints from Viivi's body, and Waidla told a third version of events.  This time, he admitted helping Sakarias drag Viivi's body to the bedroom but denied being involved in the attack.  He also admitted that Sakarias took Viivi's purse, that they pawned several of her items, and that they used her credit cards to fly to New York on July 12.

On August 30, in a tape-recorded statement made after he waived his *Miranda* rights, Waidla admitted that he had been angry with Viivi because she had "promised [him] everything and was laughing at [him]" and that he and Sakarias had no opportunities because she was telling everybody that they were on drugs.  Waidla said that after he saw Avo on July 4, he and Sakarias went to the Crestline cabin and stayed there until July 11.  From the cabin, they took a "hammer" and a screwdriver and then broke into the Piirisilds' house to get food.  Waidla confessed that he was the first to strike Viivi and said that he struck with the blunt end of the "hammer" as she came through the front door.  He also said that the hammer hit her hand and glanced off her head.  Sakarias then stabbed Viivi with the knife, they dragged her body into a bedroom, and eventually left.

The police later found the Crestline cabin in a state of disarray.  The rear window of the cabin had been broken, and the cabin was strewn with dirty dishes, cigarette butts, tobacco debris, and empty liquor containers.  *Id.*  Laying out in the open on a table, the police found a receipt for a DMV identification application with Waidla's name on it.

## B

Waidla and Sakarias were jointly charged with Viivi's murder, but their cases were severed before trial when Sakarias was found incompetent. At Waidla's trial, his counsel sought to suppress the pre-trial statements Waidla had made to the police because they were obtained after Waidla had invoked his right to counsel. The motion to suppress argued that "[t]he People have not indicated through any information provided during discovery that counsel was made available to the defendant, or that the defendant initiated the conversation with Detectives Crews and Pietrantoni, and defendant does not believe the People will contend at this time that either was the case."

At a pretrial status hearing, counsel reminded the court of the pending motion to suppress. The State remarked that it needed to conduct more research and was not sure whether it would seek to introduce Waidla's pretrial statements, but it agreed to produce live witnesses to litigate the issue if it decided to introduce the statements. The case proceeded to trial. Near the end of the State's case on November 15, 1990, the State indicated that it would seek to introduce Waidla's pretrial statements. In the suppression hearing that followed, Detective Pietrantoni testified that Waidla had initiated the conversation on August 29 in which he gave incriminating statements admitting to being present at the time of the murder. Finding Detective Pietrantoni credible, the trial court held that Waidla's *Miranda* waiver was valid and admitted the August 29 pretrial statements and August 30 confession. *Waidla*, 996 P.2d at 68–70.

Detective Pietrantoni's testimony that Waidla had initiated the conversation with him at Rouses Point was a surprise to the prosecutor and to the defense counsel.

Waidla's counsel sought and obtained a short continuance at the close of the State's case to reformulate his strategy because he had not expected the court to admit Waidla's confession. Defense counsel had access to the prosecutor's file during the pre-trial phase, and he knew the State doubted the confession was admissible. Waidla's counsel had not pursued a mental state defense because two pretrial mental health evaluations had concluded that Waidla had no psychiatric condition that could have prevented him from forming the intent to kill. After the court denied Waidla's motion to suppress, counsel "advised Mr. Waidla that he needed to testify to any bases for repudiating the validity of the confession and any alibi." Waidla confirmed that he could truthfully recant his confession.

When the trial resumed, Waidla testified that he was coerced by LAPD detectives, who he said had threatened to hang him if he did not parrot a confession they "fed" to him. *Id.* at 58. Personally familiar with the violent interrogation style of the KGB, Waidla said that he believed the threat and did not feel free to deny his guilt. *Id.* Before the jury, he testified to the first version of events he had relayed to Detective Pietrantoni: that he was not present when Viivi was killed because he had begun hitchhiking to New York before the murder occurred. *Id.*

During closing argument, the prosecutor argued that the jury should find that Waidla used the hatchet throughout the attack, "choosing . . . the more devastating of the instruments," while Sakarias "accept[ed]" the knife, "the lesser implement." The prosecutor argued that "Waidla first inflicted the blunt force injuries, then, turn[ed] the hatchet blade so it was more effective . . . [and he] was now able to chop through the top of her skull." The prosecutor called Dr. Ribe to testify that the abrasion on Viivi's lower back

occurred post-mortem, suggesting that she was already dead when she was dragged to the bedroom. After four days of deliberation, the jury found Waidla guilty of first-degree murder during the course of a burglary and robbery with personal use of a deadly and dangerous weapon, a capital crime. The jury also found that Waidla used the hatchet.

Sakarias's trial began approximately ten months after Waidla's trial concluded. At that trial, the same prosecutor argued that it was Sakarias who inflicted the fatal blows and that Sakarias struck all three hatchet chopping blows in the bedroom before Viivi died. The prosecutor introduced Sakarias's statements to the police in which he said that during the attack on Viivi in the living room, he used the knife while Waidla used the hatchet, and that Waidla directed him to the bedroom where Sakarias struck Viivi's head with the hatchet two more times. The prosecutor called Dr. Ribe to testify but did not ask him about the abrasion on Viivi's lower back. Accordingly, the jury at Sakarias's trial did not hear testimony opining that Viivi was most likely dead by the time Sakarias went back to the bedroom and struck her with the hatchet.

## C

Neither side presented additional evidence at the penalty phase of Waidla's trial. Defense counsel agreed with the trial court's statement that the defense had "sound tactical reasons" for resting on the mitigation evidence it had elicited during the guilt phase. The trial court stated that counsel had put forth "a tremendous amount of evidence about the defendant's background." The court specifically referred to an article that Waidla authored. It was published in a Canadian newspaper, and it gave a first-hand account of his time in the Soviet Army. The article, entitled *Escaping*

*Through the Fog*, detailed the harsh conditions Waidla experienced during his service in the military. It described that he spent long periods in the bitter cold, was given ill-fitting and dirty clothes, slept in crowded spaces, and received abysmal medical care for a respiratory infection. In the article, Waidla wrote that while in the military hospital, "[a]ll wishes to exist disappear[ed]." The article was introduced as an exhibit at trial.

Waidla's counsel later acknowledged that he had not investigated any mitigating evidence aside from that presented during the guilt phase. He did not seek out any evidence related to Waidla's positive adjustment to incarceration, although he was aware that Waidla had not been subject to any disciplinary proceedings while awaiting trial. He also made no attempts to contact Waidla's family, friends, or acquaintances from Estonia to obtain background or good character mitigation evidence. According to defense counsel, Waidla "expressed considerable reluctance" when it came to a social history investigation because he did not want his family to know about his situation and because he feared that Soviet authorities would retaliate against any Estonian who aided in his defense. When counsel revisited the question, Waidla acknowledged that his loved ones likely knew about his criminal case, but he remained concerned about their safety. Ultimately, counsel "did not definitively resolve the issue" with Waidla.

The defense counsel's penalty phase argument at Waidla's trial principally pleaded for the jury's mercy. Counsel's explanation of Waidla's struggles in the Soviet Army was limited to his observation that "after three weeks in a Russian Army hospital Mr. Waidla was so consumed by a desire for freedom . . . that he risked everything to run." Counsel also referred to the limited information available

about Waidla's background and character. He drew the jury's attention to Waidla's young age and lack of criminal history. He reminded the jury of testimony from Avo and Rita that Waidla had been friendly, nonaggressive, and helpful around the house, and argued that Waidla had been cooperative with law enforcement. Finally, counsel asked the jury to show Waidla mercy because he had no one who could testify to his character, from which the jury could infer that he was "essentially alone in this world."

The State largely argued that the horrific nature of the crime warranted the death penalty. The prosecutor detailed the brutality of the attack on Viivi. He described Viivi's wounds in detail and argued that Waidla had struck the "death blow" to her head with the sharp edge of the hatchet.[3]

The prosecutor characterized the crime as planned, calculated, and especially callous given the kindness Viivi had shown Waidla, during the year he lived with the Piirisilds. The State also attacked Waidla's character by portraying him as a deserter from the Soviet Army and as a lazy "parasite" who believed that "he deserved to be taken care of," citing his refusal to look for work or attend school. The State suggested that Waidla had a propensity for violence because he had been willing to harm others during his escape from the Soviet Army and because he carried a loaded gun when Border Patrol agents arrested him, which

---

[3] The California Supreme Court found that the "great weight of evidence indicates that Viivi Piirisild was dead or near death when dragged into the bedroom and thus that Waidla, rather than Sakarias, struck the antemortem, hemorrhagic hatch-blade blow." *In re Sakarias*, 106 P.3d 931, 948 (Cal. 2005). The court also found that the impact of the prosecutor's arguments derived from the hemorrhagic chop "through the top of her skull" or "death blow," rather than from the fact that "further blows were struck after she was dead." *Id.* at 950.

his unsent letter to Sakarias suggested he might use to harm any officer who tried to arrest him. According to the State, these incidents "revealed his violent nature" and showed that "killing doesn't mean anything to Mr. Waidla."

After hearing no new evidence from either party and less than a day's worth of argument at the penalty phase, the jury went on to deliberate for just over eight days. On day three, the jury sent a note asking what would happen if it could not reach unanimity. *Waidla*, 996 P.2d at 80. On day five, the jury sent a note stating that it was deadlocked. *Id.* A poll of the jurors revealed that ten of twelve believed they could not come to a unanimous verdict. The court asked the jury to continue deliberating. *Id.* On the morning of day nine, the jury returned a death verdict. *Id.*

## D

The California Supreme Court rejected Waidla's Fifth Amendment claim on direct appeal, *Waidla*, 996 P.2d at 71, and summarily denied his ineffective assistance of counsel claims on the merits. Waidla filed state petitions for postconviction relief. In them, he asserted, among other claims, ineffective assistance of counsel at the guilt and penalty phases, prosecutorial misconduct, and failure to suppress his confession as required by the Fifth Amendment.[4]

---

[4] The California Supreme Court denied Waidla's first habeas petition, which included guilt-phase ineffective assistance of counsel claims for failure to seek an earlier adjudication of Waidla's motion to suppress his pretrial statements and failure to investigate and rebut the State's fingerprint evidence. The state court summarily denied these claims on the merits. In his second state petition, Waidla reasserted the same guilt-phase claims and added penalty-phase ineffective assistance of counsel

In support of his claim of ineffective assistance of counsel at the penalty phase, Waidla offered three categories of mitigation evidence that could have been presented had counsel conducted a more complete investigation: (1) evidence of his psychosocial history and character; (2) evidence of the abuse faced by Estonians serving in the Soviet Army; and (3) evidence that he had behaved well in custody before trial.

Mare Pork, a professor of clinical psychology in Estonia, interviewed Waidla's family members, friends, and teachers in support of Waidla's postconviction claim. Dr. Hillevi Ruumet, an Estonian-American clinical psychologist, conducted interviews that corroborated the information gleaned from Pork's interviews. We recount their relevant combined findings.

Waidla's parents asked Waidla's great-uncle Gunnar and Waidla's grandmother Linda to raise him when he was just one month old. Waidla saw his mother only occasionally after that and essentially never saw his father. When Waidla was 11 years old, Linda developed a debilitating brain tumor. From that time until she passed several years later, she became "uncontrollably abusive" to those around her. Waidla became very attached to Gunnar, who "in many ways took the place of both mother and father" for Waidla. As a teen, Waidla's favorite cousin and an aunt who had taken on the role of his primary female caregiver died in a house fire, which devastated him. In all, three maternal figures—his mother, grandmother, and aunt—abandoned him or passed away before Waidla turned 15.

---

claims. The state supreme court denied these claims as untimely, repetitive, and on the merits.

Waidla displayed "a strong will to succeed" and a "desire for excellence" in his athletic pursuits. He attended a prestigious sports school for marksmanship, where his coach recalled that Waidla "was the best shooter in his [grade] and the only one who spent more hours training than was required by the overall training schedule." A headmistress from his school recalled that he was a quick learner but did "just enough homework to get by." In all, Waidla seemed to focus more on sports, but maintained adequate grades. Waidla developed a "reputation among his teachers and coaches [for] having a lot of willpower and a desire to fight for justice." According to a family friend who was a well-known photographer, Waidla also showed a facility for photography. He published several photographs in magazines and newspapers.

Gunnar recalled that Waidla "never showed a violent or aggressive nature" in social environments and was not one to get into fights with peers. Waidla's primary marksmanship coach similarly recalled that Waidla "was a consistently peaceable and non-violent youth, who was never aggressive or bullying toward his classmates or other competitors." Other coaches and students at the school concurred in that assessment.

In support of his efforts to seek post-conviction relief, psychologist Dr. Myla Young evaluated Waidla to determine whether he posed a risk of violence in a carceral setting. Personality testing showed that Waidla had a "pro-social orientation" and was a "fundamentally non-violent, non-confrontational individual." Dr. Young reported that, over the ten years she had spent evaluating individuals in criminal proceedings, Waidla exhibited "fewer risk factors to violence than any individual [she had] ever examined."

Dr. Young reviewed information about Waidla's background that supported her clinical findings. She opined that Waidla had "a very difficult and stressful early life." She found it notable that despite the "traumatic separation" from his parents, Waidla "was able to achieve strong psychological and emotional bonding with his Great-Uncle Gunnar and other members of the family." In Dr. Young's opinion, these connections "permitted Mr. Waidla to develop [an] intact personality structure." Waidla's well-formed personality structure was consistent with "the positive efforts he made within the family and in his academic and athletic efforts," as well as his "impeccable record of peaceableness [sic]" outside of Viivi's murder. Dr. Young concluded that Waidla's was "a very unusual case in which an otherwise pro-social, law-abiding, and high-achieving individual lapsed into a momentary assaultive outburst . . . and [that he] has led an entirely non-violent life both before and afterward."

Dr. Ruumet also conducted clinical interviews of Waidla. Based on those interviews and her assessment of Waidla's background, she confirmed the psychological conclusions reached by Dr. Young. Her clinical evaluation showed that Waidla was "passive, intelligent, socially appropriate and invested in giving a good impression, respectful of authority, diffident, and avoidant of any confrontation or physical violence." In fact, she found that Waidla displayed a "characterological aversion to confrontation and violence."

Waidla also offered postconviction evidence of the cruelty endured by Estonian conscripts in the Soviet Army. Dr. Ruumet declared that serving in the Soviet Army in the 1980s as an Estonian was "a guarantee of extended physical beatings and brutality" and carried a serious risk of death.

Hazing was rampant and "any superior could, with total impunity, inflict any kind of physical or mental suffering on any inferior at any time and for any (or no) reason." Dr. Ruumet conveyed the story of an Estonian soldier who died of kidney failure because he was denied water as a form of punishment. According to Dr. Ruumet, such stories were not "isolated incident[s]." These conditions were the product of Russians' longstanding prejudice against Estonians, with whom Russians had ethnic and linguistic differences. Waidla sent a letter to family during his service asking for their help. In it, he expressed suicidal thoughts and fear for his life.

Finally, at the post-conviction stage, Waidla provided evidence that he had adjusted to incarceration without disciplinary incident. The State produced an internal memorandum from the District Attorney's office evaluating whether the death penalty was appropriate for Waidla and Sakarias in January 1989, several months after Waidla's arrest (the "DA memo"). The DA memo reported that while incarcerated, Sakarias had been found in possession of weapons several times. Whereas Sakarias had been designated an escape risk and the DA memo concluded that he was "a danger to others even while in custody," the memo was silent as to Waidla's disciplinary history and observed that Waidla did not "evidence the same degree of danger to society."

Waidla submitted a declaration detailing his positive experience in Wayside Maximum Security, where he was incarcerated for three months before trial. He applied for and obtained jobs in the kitchen and maintenance units. He received a uniform reserved for inmates with a clean behavioral record as well as a pass that allowed him to work outside of the dormitories. He swept, passed out toilet paper,

and buffed floors.  Waidla spent his free time in the library reading the newspaper and improving his English.  Unlike most inmates, he was allowed to read in the library rather than taking his reading materials to his cell.

When Waidla was transferred to San Quentin State Prison after trial, California Department of Corrections officials conducted Waidla's orientation review to assign him housing (the "CDC document").  The officials at San Quentin verified Waidla's statement that he had "no problems programming in the county jail" by contacting the jail.  An unidentified official at the jail "stated that Waidla was not a disciplinary problem and programmed well with other inmates."

### E

Sakarias and Waidla both argued in their petitions for postconviction relief that the prosecutor had presented factually inconsistent theories at their respective trials.  For this reason, the California Supreme Court consolidated their petitions for consideration of the prosecutorial misconduct claim.  The Court appointed a referee to conduct a hearing on the claim and, in a reasoned opinion, subsequently concluded that the prosecutor had violated Sakarias's due process rights by "intentionally and without good faith justification arguing inconsistent and irreconcilable factual theories in the two trials, attributing to each petitioner in turn culpable acts that could have been committed by only one person." *In re Sakarias*, 106 P.3d at 934.  The court could not conclude beyond a reasonable doubt that the prosecutorial argument that Sakarias struck all the hatchet-blade blows played no role in Sakarias's penalty-phase verdict. *Id.* at 949.  The court therefore set aside Sakarias's death sentence. *Id.* at 949–50, 952. As to Waidla, the

California Supreme Court did not decide whether the prosecutor's inconsistent theories had constituted a due process violation because it deemed any misattribution harmless. *Id.* at 950–51.

The court explained that the jury in Waidla's case had heard that when Viivi entered through the front door, Waidla hit her in the head with the blunt part of the hatchet with such force that it fractured several bones and knocked out her teeth, and then likely "turned the hatchet around and struck Viivi with the sharp blade with such force as to penetrate her skull and cut a flap of skull and scalp from the top of her head." *Id*. at 950. Although the prosecutor likely misattributed to Waidla two post-mortem hatchet blows, the court concluded that in light of the strong evidence that Waidla struck the initial pre-mortem hatchet blow—and likely delivered the other hatchet blows inflicted in the entryway where Viivi died—the false attribution was harmless.[5] *Id.* The court denied Waidla's Eighth Amendment claim in a footnote that concluded the "attribution of blows [did not] make Waidla's penalty determination unreliable." *Id.* at 951 n.11.

Waidla filed the operative petition in federal district court for the Central District of California pursuant to 28 U.S.C. § 2254 on March 17, 2006. He asserted eleven claims for relief related to: (1) the trial court's denial of his motion to exclude his confession in violation of the Fifth

---

[5] The court noted that the crime scene evidence showed a large pool of blood in the living room, a minimum blood spatter on the bedroom walls and ceiling, and the lack of blood on the bedroom floor and observed that this constituted strong physical evidence that Viivi's hemorrhagic wounds were inflicted during the initial attack on her in the living room, where she died. *See In re Sakarias*, 106 P.3d at 948.

Amendment; (2) law enforcement officers' failure to advise him of his rights under the Vienna Convention on Consular Relations; (3) ineffective assistance of trial counsel at the guilt phase of trial; (4) prosecutorial misconduct; (5) judicial misconduct; (6) the Los Angeles County District Attorney's decision to seek the death penalty; (7) judicial bias in favor of the death penalty; (8) ineffective assistance of trial counsel at the penalty phase; (9) the trial court's refusal to answer the jury's penalty phase questions; (10) the jury's reliance upon his non-testimonial demeanor; and (11) the jury's reliance on "extraneous and inaccurate" information.

The district court held a four-day evidentiary hearing beginning on March 17, 2009. The Supreme Court subsequently issued a decision in *Cullen v Pinholster*, 563 U.S. 170, 181 (2011) holding that the threshold determination in adjudicating a § 2254(d) petition is limited to the state–court record. At that point, the district court recognized that the initial review of Waidla's petition could not include consideration of new evidence offered for the first time in federal court.

Ultimately, the district court granted relief on Waidla's claim of ineffective assistance at the penalty phase and rejected Waidla's remaining claims. The State now appeals the decision granting penalty phase relief and Waidla cross-appeals the denial of relief on his Fifth Amendment and guilt-phase ineffective assistance claims. Waidla also reasserts his prosecutorial misconduct claim as an alternative basis for affirming the district court's grant of penalty-phase relief.

We review de novo the district court's denial of Waidla's habeas petition. *See Gulbrandson v. Ryan*, 738 F.3d 976, 986 (9th Cir. 2013). Under the Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, we review the last reasoned state court opinion. *See Tamplin v. Muniz*, 894 F.3d 1076, 1082 (9th Cir. 2018). Here, because of the unusual consolidation of the postconviction petitions on the prosecutorial misconduct claim, we consider two reasoned state-court decisions: (1) the California Supreme Court's decision on Waidla's direct appeal, *People v. Waidla*, 996 P.2d 46 (Cal. 2000); and (2) the California Supreme Court's decision on Waidla's second state habeas petition, which was consolidated with Sakarias's, *In re Sakarias*, 106 P.3d 931 (Cal. 2005).

A court may not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id*. § 2254(d)(2).

## II. Waidla's Cross-Appeal

The district court denied relief on Waidla's two claims of guilt-phase error, which Waidla raises on cross-appeal. We consider these claims before we turn to the State's penalty-phase appeal. Waidla first contends that his Fifth Amendment rights were violated when the State introduced his confession at trial. Second, Waidla asserts that he received ineffective assistance of counsel during the guilt phase. Reviewing under 28 U.S.C. § 2254(d), we agree with the district court's assessment that Waidla's claims lack merit.

A

Waidla argues that his confession was improperly admitted in violation of the Fifth Amendment. We provide factual background before turning to the claim.

Six weeks after the murder, Border Patrol agents apprehended Waidla in New York near the Canadian border and arrested him on suspicion of illegal entry into the country. *Waidla*, 996 P.2d at 69. During the interrogation at a Border Patrol station in Rouses Point, New York, Waidla invoked his right to counsel and was then moved to another facility where he was detained. *Id.* The next day, a Border Patrol agent transported Waidla back to Rouses Point, where he encountered Detective Pietrantoni. *Id.* At a suppression hearing held outside the jury's presence during Waidla's trial, Detective Pietrantoni and Waidla gave differing testimony regarding what transpired at Rouses Point. Because the trial court found Detective Pietrantoni more credible, we recount his version of events. *Waidla*, 996 P.2d at 71.

On August 29, 1988, officers moved Waidla from a holding cell at Rouses Point and took him into an administrative area where he saw Detective Pietrantoni dressed in civilian clothes. Detective Pietrantoni and another officer had flown to New York to interrogate Waidla and to take him back to Los Angeles following an extradition hearing. Detective Pietrantoni was unaware that Waidla would enter the administrative area at that moment. Speaking first, Waidla asked: "You're the detective from Los Angeles?" When Detective Pietrantoni confirmed that he was, Waidla asked either, "What do you want from me?" or "What can I do for you?" *Id.* A conversation ensued in which Waidla first provided an alibi and then admitted

minimal involvement in Viivi's murder. The following day, August 30, Detective Pietrantoni met with Waidla again and administered *Miranda* warnings that Waidla waived. In a recorded statement, Waidla confessed that he was present when Viivi was murdered and that he was the first to strike her with the hatchet.

The trial court ruled that Waidla's confession and pre-trial statements to the police were admissible because it found that, although Waidla had invoked his right to counsel, he later initiated the dialogue with Detective Pietrantoni at Rouses Point. *Id.* at 70. On direct appeal, the California Supreme Court upheld the trial court's factual finding that Waidla had started the conversation although he had been given *Miranda* warnings and requested counsel. The California Supreme Court relied on *Edwards v. Arizona*, 451 U.S. 477 (1981), to conclude that, as a matter of law, Waidla's question to Detective Pietrantoni amounted to initiation of interrogation that constituted waiver of *Miranda*. *Id.* at 71.

The California Supreme Court did not unreasonably apply *Edwards* and its progeny when it upheld the admission of Waidla's pre-trial statements and confession. *Edwards* holds that a suspect who has invoked the right to counsel may not be "subject[ed] to further interrogation by the authorities until counsel has been made available[]to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484–85. Initiating statements are those that "represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (plurality opinion).

Fairminded jurists could conclude that law enforcement did not recommence interrogation in the sense relevant to the *Edwards* analysis. Cases finding *Edwards* violations involve police-initiated meetings that a suspect *understands* are interrogation attempts. *See Edwards*, 451 U.S. at 487 (recounting that police officers "told Edwards that they wanted to talk to him"); *Minnick v. Mississippi*, 498 U.S. 146, 149 (1990) (explaining that jailers told Minnick he would "have to talk" to an officer who arrived to interview him and "could not refuse"). Unlike the suspects in those cases, Waidla had little reason to expect that he would be questioned when he encountered Detective Pietrantoni. Waidla testified at the suppression hearing that he did not recognize Pietrantoni, and testified at trial that he had no idea why he had been transported to Rouses Point, and he maintained that position before the district court.[6] Moreover, Detective Pietrantoni was not in uniform at the time, the encounter did not begin in an interrogation room, and Waidla does not argue that other contextual cues suggested to him that interrogation was requested or planned. Thus, it is reasonable to conclude that Waidla did not experience his encounter with Detective Pietrantoni as a coercive attempt at further interrogation.

---

[6] Detective Pietrantoni's explanation for Waidla's behavior, credited by the trial court, was that Waidla may have seen Detective Pietrantoni when he went to an Estonian cultural center in New York looking for Waidla and therefore recognized Pietrantoni at Rouses Point. *Waidla*, 996 P.2d at 69. A fairminded jurist could still conclude, however, that even if Waidla recognized Detective Pietrantoni in New York, he may have been unaware that the detective was present for purposes of interrogating him. Thus, this court and the trial court can validly rely on Waidla's testimony that he lacked awareness of the reason for his transport.

Considering that Waidla did not know the purpose for his transport, it is insufficient for him to observe that law enforcement brought about his encounter with Detective Pietrantoni. As the California Supreme Court recognized, no Supreme Court case has found an *Edwards* violation solely because the police initiated the meeting at which the suspect made incriminating statements. *Waidla*, 996 P.2d at 71. *Edwards* created a prophylactic rule to protect suspects from the coercive effect of persistent interrogation attempts. *See Maryland v. Shatzer*, 559 U.S. 98, 104–05 (2010). But not all police-initiated meetings following an invocation of rights carry coercive potential. A reasonable jurist could conclude that, absent a suspect's belief that he will be questioned during an encounter, the coercive effect of a police-initiated interaction is minimal. Thus, even if law enforcement manufactured Waidla's contact with Pietrantoni, that would not, on its own, render his statements and confession inadmissible.

We reach the same conclusion when considering the question, as Waidla urges us to, under *Rhode Island v. Innis*, 446 U.S. 291 (1980). *Innis* holds that law enforcement engages in the "functional equivalent" of interrogation when it takes action that is "reasonably likely to elicit an incriminating response." *Id.* at 301. The *Innis* analysis "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* Here, fairminded jurists could conclude that because Waidla did not know he was transported to facilitate further interrogation, simply encountering Detective Pietrantoni was not reasonably likely to draw any admissions from him. There is no evidence to suggest that any involved officer could have predicted that Waidla would recognize Pietrantoni as a detective when he was wearing civilian clothes. Waidla's

response was therefore an "unforeseeable result[]" of delivering him into Pietrantoni's presence. *Id.*

Finally, Waidla suggests that his question to Detective Pietrantoni was vague and possibly hostile, rather than a clear attempt to initiate further interrogation. But even the more ambiguous formulation of Waidla's question—"What do you want from me?"—was no less ambiguous than the phrase that initiated further interrogation in *Bradshaw*: "Well, what is going to happen to me now?" 462 U.S. at 1045 (plurality opinion). The California Supreme Court reasonably concluded that Waidla's question "represent[ed] a desire . . . to open up a more generalized discussion," particularly considering Pietrantoni's testimony that before he began his questioning, Waidla interrupted him several times with offers to discuss the investigation. *Waidla*, 996 P.2d at 69 (quoting *People v. Mickey*, 818 P.2d 84, 98 (Cal. 1991)).

## B

Waidla also raises a claim of ineffective assistance at the guilt phase. He contends that counsel rendered ineffective assistance in four areas: (1) investigating and litigating the motion to suppress Waidla's confession; (2) counseling Waidla to recant his confession and testify to an alibi; (3) failing to investigate alternative defenses; and (4) failing to rebut the State's expert testimony regarding the lifespan of fingerprints.

To prevail on his ineffective assistance of counsel claim, Waidla must show that counsel's performance "fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and that "there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different," *id.* at 694.

Because 28 U.S.C. § 2254(d) applies, we defer to a state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." We may grant Waidla habeas relief only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Our review is doubly deferential when we apply the *Strickland* and § 2254(d) standards in tandem. *See id.* at 101. Here, we do not hesitate to conclude that the California Supreme Court reasonably could have concluded that counsel met *Strickland*'s performance standard as to two of the alleged deficiencies and that the remaining alleged deficiencies did not prejudice Waidla.

*Motion to Suppress.* Waidla identifies two shortcomings in counsel's litigation of the motion to suppress his confession: (1) the failure to press for an earlier decision on the motion; and (2) the failure to investigate more thoroughly. The first argument fails because it incorrectly presumes that counsel had control over the timing of the trial-court ruling on his motion to suppress. The second fails because it impermissibly relies on facts knowable only in hindsight.

Defense counsel filed a motion to suppress in advance of trial. At that point, it appeared possible that the State would not seek to introduce Waidla's confession. The trial court had discretion to hear the motion at a time of its choosing,

and it acceded to the State's request to defer the issue. Waidla does not point to any feature of state law that would have allowed defense counsel to compel the court to hold a hearing sooner. Thus, counsel reasonably refrained from making a likely futile request for an earlier hearing.

Based on what he knew at the time, counsel reasonably could have determined that further investigation of the motion to suppress was unnecessary because it was reasonable to anticipate that Detective Pietrantoni would not testify. The prosecutor had given counsel full access to his files, and the files showed that the State had preliminarily concluded that Waidla's statement was likely obtained in violation of *Arizona v. Roberson*, 486 U.S. 675 (1988), a case applying the rule set out in *Edwards*. Defense counsel was surprised by Detective Pietrantoni's testimony at the suppression hearing, but that cannot be equated with deficient performance. Even the prosecutor was surprised by Detective Pietrantoni's testimony that Waidla initiated the conversation at Rouses Point. Nor was there any mention of this in police records. Thus, counsel had little reason to think that interviewing the officers involved or conducting additional investigation would inform his strategy for arguing the suppression motion. That is especially true because Waidla maintained that he had not initiated the interrogation. *See Strickland*, 466 U.S. at 691 ("[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether."). *Strickland* cautions that we must not fall prey to the "distorting effects of hindsight" in assessing counsel's performance. 466 U.S. at 689. For these reasons, we cannot

say that the California Supreme Court unreasonably concluded that counsel's performance was not deficient.

*Waidla's Testimony.*    Faced with the trial court's decision to admit Waidla's extremely damaging tape-recorded confession, counsel made a strategic decision to advise Waidla to testify.  Waidla argues that counsel's choice fell short of objectively reasonable standards of representation.  But reviewing under 28 U.S.C. § 2254(d), we cannot conclude that the California Supreme Court unreasonably applied *Strickland*'s performance prong.

Counsel made the reasonable tactical judgment that letting the confession stand uncontested would have proved fatal to Waidla's defense.  Waidla confessed not only to his presence during the crime, but to waiting for Viivi to enter her home and being the first one to strike her in the head with the murder weapon.  Failing to dispute the validity of this confession would have left the jury with little room to form a reasonable doubt as to Waidla's guilt.  Thus, defense counsel's advice that Waidla should testify did not fall below an objectively reasonable standard.  Indeed, presenting Waidla's testimony "was the only way to potentially rebut" the State's overwhelming evidence of guilt.  *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005).

*Failure to Investigate Alternative Defenses.*    Waidla argues that counsel rendered ineffective assistance by failing to investigate any alternative defense strategy.  Counsel admitted in a postconviction declaration that he prepared just one approach—seeking suppression of Waidla's confession and casting doubt on the State's evidence of Waidla's involvement.  Counsel was forced to abandon his original strategy when the trial court denied the motion to suppress.  Waidla suggests that one viable alternative defense theory

was that he was at the scene of the crime because he intended to negotiate Viivi's debt to him. Another posited that he was at the house on the day of the crime but did not participate in Viivi's murder. *Id*. Waidla also argues that counsel should have investigated a mental state defense based on diminished capacity because the two pretrial psychological evaluations found only that Waidla was generally capable of forming an intent to kill, not that he in fact formed that intent.

Fairminded jurists could conclude that even if counsel had offered evidence that Waidla was at the Piirisilds' home but uninvolved in the murder, there was no reasonable probability the jury would have reached a different verdict. Waidla's argument that he could have offered testimony showing that his intent was to confront Viivi and obtain payment for his household work is contradicted by the evidence. The evidence strongly suggested that Viivi was hit in the head immediately after she entered the house, the coroner testified that she did not have defensive wounds, and there was no evidence that Waidla attempted to talk to her on the day of the murder about collecting the debt he claimed she owed him or anything else. This theory would have failed for the same reason Waidla's alibi at trial failed: it was swamped by his confession. The claim that he was there when Viivi was killed but uninvolved in her murder would have been undermined by objective evidence of Waidla's consciousness of guilt: Waidla fled after the crime, reacted strangely when an acquaintance told him about Viivi's death, and gave a series of changing and conflicting stories to the police about his presence during the crime. *Waidla*, 996 P.2d at 57, 69. Especially because we view this claim under the deferential standard demanded by AEDPA, Waidla does not show that fairminded jurists could not disagree that counsel's performance was deficient for failing

to advance an alternative defense based on Waidla's non-involvement.

As for a mental state defense, the evaluations available to defense counsel at the time of trial did not support such a theory, so counsel was not deficient for not pursuing it. Even at the post-conviction stage, Waidla offered minimal evidence of diminished capacity or severe emotional disturbance in support of his petition. Only one postconviction psychologist's evaluation assessed Waidla as suffering from dissociative disorder, and even that evaluation did not go so far as to suggest that Waidla's dissociative disorder prevented him from forming the requisite intent to kill Viivi.

Moreover, the evidence showed that the crime was planned and deliberate, making it less likely that a mental state defense would have been persuasive, and Waidla was not prejudiced by his counsel's failure to pursue it. Waidla waited until Avo was out of town to confront Viivi; he took the hatchet from the Piirisilds' cabin for the confrontation; he parked some distance from Viivi's house, presumably to avoid alerting her to their presence; and he stood inside the Piirisilds' home with the hatchet, waiting for Viivi to return. *Id*. at 56–57. These considered actions tend to show that Waidla acted with foresight and deliberation throughout the crime. Thus, fairminded jurists could conclude that a mental state defense would not have been persuasive. *See Crittenden v. Ayers*, 624 F.3d 943, 960–63 (9th Cir. 2010) (finding no prejudice when counsel presented an alibi defense over a mental state defense because the evidence overwhelmingly established deliberation and premeditation).

*Fingerprint Lifespan.* Waidla's counsel did not present expert testimony to rebut testimony from a State witness that fingerprints have a "lifespan" of only ten days to three weeks. *Waidla*, 996 P.2d at 57. But at the post-conviction stage, counsel presented the declaration of a latent fingerprint examiner and fingerprint consultant who opined that there is no known lifespan for fingerprints, and "a latent impression can last indefinitely in a latent state." Waidla argued that the State's evidence on this point was false and that he could have left his fingerprint on the Piirisilds' deadbolt when he was last in the Piirisilds' home, more than six weeks before the crime. Even assuming counsel performed deficiently by failing to offer robust rebuttal testimony to counter the State's fingerprint expert, the California Supreme Court reasonably could have concluded that Waidla was not prejudiced by counsel's performance.

Without the fingerprint evidence, the State's evidence still overwhelmingly showed that Waidla was present at the Piirisilds' home during the crime. Most notably, Waidla confessed that he had been there. *Waidla*, 996 P.2d at 58. A neighbor also identified Waidla as one of two men he had seen walking to and from the Piirisilds' home around the time of the crime. *Id.* at 56–57. The State presented evidence of cigarette butts found inside the house that matched Waidla's (but not Sakarias's) blood type, which was significant because Viivi did not allow smoking inside the house and therefore it was reasonable to infer an invited guest would not have left the cigarettes. *See id.* at 57. Waidla and Sakarias pawned green jade earrings and a black star sapphire pendant that they had taken from the Piirisilds' home. *Id.* at 57. Finally, the evidence showed that Waidla had fled to the East Coast after the crime, *id.* at 57–58, showing consciousness of guilt. *See People v. Bradford*, 929

P.2d 544, 575 (Cal. 1997) (explaining relevance of flight to jury's determination of guilt).

From the outset, the defense theory that Waidla left a fingerprint over six weeks before the crime strained credulity.  Witnesses testified that Viivi was a thorough and frequent cleaner.   In line with that testimony, police investigators found only seven fingerprints in the entire home, suggesting that it had been recently cleaned.  Yet Waidla argues that a jury would have concluded that a fingerprint on the deadbolt lock, a high-touch surface, somehow survived for over a month and that this would have added weight to his contention that he was not inside the house on the day of the murder.  Considering the weakness of this theory and the overwhelming evidence of Waidla's presence at the scene of the crime, the California Supreme Court did not unreasonably conclude that there was no reasonable probability that the jury would have reached a different outcome had defense counsel offered evidence to refute the State's fingerprint lifespan testimony.

*Cumulative Error.*   Finally, Waidla raises a claim of cumulative error, arguing that the aggregate effect of counsel's performance at the guilt phase prejudiced him.  In assessing a cumulative error claim, we do not consider the prejudicial effect of nonexistent errors. *See United States v. Jeremiah*, 493 F.3d 1042, 1047 (9th Cir. 2007).   Even assuming counsel performed deficiently by failing to investigate additional defenses and failing to present rebuttal testimony on the lifespan of fingerprints, Waidla cannot prevail on his claim of cumulative error.   Waidla's fingerprint claim posits that he was robbed of an opportunity to convince the jury that he was *not* present during the crime, while his failure-to-investigate claim proceeds on the assumption that he *was* present.   Thus, counsel's alleged

missteps lack the "symmetry" that would cause them to "amplify each other in relation to a key contested issue in the case," resulting in cumulative prejudice. *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011).

### III.  The State's Appeal

The State appeals the district court's order granting penalty-phase relief on Waidla's claim that his counsel rendered ineffective assistance by failing to investigate and present mitigation evidence that competent counsel would have discovered.  We do not reach *Strickland*'s performance prong.  We conclude, under AEDPA, that the California Supreme Court's conclusion that Waidla was not prejudiced by his counsel's alleged errors was not unreasonable, and we reverse.

### A

When assessing prejudice, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534; *see Mickey v. Ayers*, 606 F.3d 1223, 1245 (9th Cir. 2010) (noting that the Supreme Court has "reaffirmed that the facts of the crime play an important role in the prejudice inquiry"). Prejudice is satisfied if, considering all the evidence adduced at trial and in the state habeas proceedings, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.  Considering the arguments or theories that "could have supported" the California Supreme Court's summary denial of this claim, fairminded jurists could conclude that Waidla was not prejudiced by his counsel's failure to present mitigating evidence. *Richter*, 562 U.S. at 102.

*Background and Character Evidence.* As an initial matter, it is unclear the extent to which the jury would have viewed the unpresented evidence of Waidla's psychosocial history and character as mitigating. The evidence of Waidla's background in Estonia suggests that he had a difficult childhood and that all three important women in his life died. *See Andrews*, 944 F.3d at 1117 ("[A] background of severe abuse, neglect, and disadvantage . . . is important to a sentencer's accurate determination of the defendant's moral culpability."). On the other hand, he was taken in and raised by a caring great-uncle and did well at school, even gaining admission to a special sports school where he excelled in marksmanship. That Waidla was able to "achieve strong psychological and emotional bonding with his Great-Uncle Gunnar and other members of the family" suggests that he was capable of developing normal relationships with those who cared for him. *See Bell v. Cone*, 535 U.S. 685, 701–02 (2002) (observing that evidence of an unremarkable youth might "cut the other way"). In this light, reasonable jurors could have decided that Waidla's premeditated murder of the woman who took him in and treated him like family after he escaped from the Soviet Army and was granted asylum in this country made him more morally culpable, not less. Further, emphasizing Waidla's close relationships would have precluded one of the primary themes in counsel's argument: that Waidla was "essentially alone in this world, and maybe because of that is to be a bit pitied rather than despised."[7]

---

[7] The more contemporaneous declarations of Estonian-Americans who met Waidla after he arrived in the United States are also not necessarily mitigating. One declarant stated that it appeared Waidla and Sakarias

Presenting evidence of Waidla's mental health would have been extraordinarily risky and likely counterproductive. Had Drs. Young and Ruumet testified at trial, the prosecutor could have cross-examined them about the very different versions of the crime that Waidla had relayed to them. *See Wong v. Belmontes*, 558 U.S. 15, 24–25 (2009) (per curiam) (considering potential rebuttal evidence that could counter potential mitigating evidence). In his interviews with Drs. Young and Ruumet, Waidla admitted only that he broke into the Piirisilds' house to collect a debt he believed he was owed, and he expressed remorse for his crimes. He also minimized his role and blamed Sakarias for instigating the crimes. When he talked with Dr. Ruumet, Waidla did not mention that he used the hatchet. When he talked to Dr. Young, Waidla said that he grabbed a hatchet he found outside the house and when Viivi came home, saw them and went "ballistic," this caused him to strike her once with it. Waidla told Dr. Young that after he and Viivi both fell, she grabbed the hatchet and Sakarias started stabbing her. All of these versions differed dramatically from Waidla's confession that he struck the first blow, and they certainly conflicted with his trial testimony that he was not in town at the time Viivi was murdered. Presenting the testimony of Drs. Young or Ruumet at trial would have opened the door to blistering cross-examination regarding the conflicting ways Waidla

---

lacked the maturity to handle being in the United States and that they were incapable of grasping available opportunities. Another declared that when Waidla and Sakarias arrived in the United States, they seemed to have some fantasy about what it was like to live in "the decadent West." These declarations could further support the prosecutor's description of Waidla as someone who had no desire to work or better himself and who believed he deserved to be cared for by others.

had described the crime and his statements deflecting blame to Sakarias. It also risked losing all credibility with the jury. *See* ABA Guidelines, 11.7.1(B) (1989) ("If inconsistencies between guilt/innocence and penalty phase defenses arise, counsel should seek to minimize them by procedural or substantive tactics.").[8] Reasonable jurists could decide that competent counsel would have chosen not to present the defense's mental health expert opinions.

Given this backdrop, even if the additional evidence of Waidla's background and character did have a net mitigating value, it is unclear how much weight jurors would have given to Waidla's past life experiences. By the time the case got to the penalty phase, the jury had heard his recorded confession, *see Waidla*, 996 P.2d at 53, and Waidla had taken the witness stand and testified to the first version of events he relayed to Detective Pietrantoni, in which he claimed to be on the East Coast at the time of the murder, *id*. at 58. After extensive deliberation, the jury found Waidla guilty of first-degree murder beyond a reasonable doubt. In doing so, the jurors necessarily found that he had lied to them under oath. *See Bemore v. Chappell*, 788 F.3d 1151, 1172 (9th Cir. 2015) ("[A] good character defense was unlikely to

---

[8] Introducing Dr. Ruumet's testimony would have provided the prosecution with additional fertile ground for cross-examination because Dr. Ruumet was born in Estonia, and her declaration included the statement that in Estonian culture, it was typical for individuals to engage in "frontier justice." For example, if someone refused to pay a debt even when confronted, "there would follow stages of physical retribution ranging from damage to the person's property to, in extreme cases, physical injury which escalated until the debt was paid." A jury could interpret this explanation of Estonian culture to support the prosecutor's argument that because Waidla felt Viivi owed him more than she had given him, Waidla resorted to "frontier justice," intending to beat her until she paid or died.

be persuasive to a jury that had just decided that Bemore had carried out a grizzly murder . . . and had lied on the stand to boot.").

*Experience in the Soviet Army*.  Waidla argues that had the jury heard more evidence about the difficulties and hardships he encountered while serving in the Soviet military, it might have made a difference to the outcome of the penalty phase.  This argument fails because the jury had Waidla's first-hand account of the inhumane conditions, bullying, and constant fear of death he experienced as a conscript through his article, "Escaping the Fog."  The jury also heard guilt-phase testimony that Estonia was under Soviet occupation and that Waidla received political asylum in the United States after escaping from the Soviet Army.  Avo testified that draftees from the Baltic states were not treated well in the Soviet Army.  Although additional corroborating evidence might have been helpful to this claim, fairminded jurists could disagree about whether the failure to offer it was prejudicial because additional evidence could be viewed as cumulative or as carrying insufficient mitigating weight, even when considered alongside Waidla's other evidence.  *See Cox v. Ayers*, 613 F.3d 883, 899–900 (9th Cir. 2010) (cumulative penalty evidence "adding to what was already there would have made little difference" (quoting *Belmontes*, 558 U.S. at 22)).

*Positive adjustment to incarceration*.  Waidla argued that his counsel was ineffective for failing to offer admissible evidence showing that he had a good disciplinary record in pre-trial detention and that he had adjusted well to prison life.  At the post-conviction stage, Waidla submitted a California Department of Corrections document dated March 15, 1991.  It was initialed by two correctional officers at San Quentin prison and it memorialized Waidla's security

classification when he was transferred to that facility. The document reflects that Waidla informed the correctional officers that he had no problems programming in the county jail while he awaited trial, knew of no enemies at San Quentin, and did not have a gang affiliation. The document also reflects that officers at San Quentin verified this information by contacting the county jail. An unidentified source there stated that Waidla was not a disciplinary problem and programmed well with other inmates.

Waidla raised his penalty-phase argument that defense counsel was ineffective for failing to offer evidence of his adjustment to incarceration in his first and second post-conviction petitions. The California Supreme Court denied Waidla's first petition on the merits and denied the second petition, which addressed penalty-phase claims, as untimely, repetitive, successive and on the merits. In our view, fairminded jurists could reasonably conclude that the omission did not prejudice Waidla.

Post-*Pinholster*, the district court recognized that its threshold ruling on Waidla's § 2254(d) petition could not consider evidence offered for the first time in federal court. In response to the court's request for filings on the impact of *Pinholster*, the State considered the arguments or theories that could have supported the state court's summary denial of this claim, *Richter*, 562 U.S. at 103, and argued that the California Supreme Court would have rejected the Department of Corrections document because it "consisted entirely of hearsay." The State's brief on appeal repeated the argument that the document could have been rejected by the California Supreme Court as hearsay. We agree that the California Supreme Court reasonably could have deemed this document inadmissible.

The remaining evidence offered in support of this clam was Waidla's own declaration describing his time as a pretrial detainee from June through August 1990. It described recognition Waidla received for his alleged good behavior in jail. Fairminded jurists could decide that the jury might have rejected his declaration because, in rejecting his alibi and finding him guilty, it had already determined that he was not a credible witness. Alternatively, the state court could have determined that this period of Waidla's pre-trial detention was too short to carry significant weight, even when considered with his other evidence, given the exceptionally violent nature of the murder.

That Waidla was not prejudiced by the failure to present this mitigating evidence becomes especially clear when comparing the mitigating evidence with the substantial aggravating evidence. On direct appeal, the California Supreme Court summarized the circumstances of the murder, "On Viivi's return, as she passed through the front door toward the living room, before she could even attempt to resist, Waidla and Sakarias set upon her, dispatched her toward death, and then dragged her to a bedroom where her body would subsequently be found." The court described in gruesome detail the multiple wounds Viivi suffered, the means and force used to inflict them, and concluded: "They caused her death through the combination of the throttling, bludgeoning, chopping and stabbing, and may have done so through any one of such means, because each was potentially fatal in and of itself." *Id*. at 57. When the California Supreme court resolved the procedural misconduct claims that Waidla and Sakarias presented in post-conviction petitions, the court emphasized the evidence that Viivi died in the living room entryway, that Waidla admitted to striking the first devastating blow, and the absence of evidence that

Waidla and Sakarias exchanged weapons. *In Re Sakarias*, 106 P.3d at 948. Though we do not think it necessary to repeat verbatim the state court's unchallenged findings regarding the injuries that resulted in Viivi's death or the force used to inflict them, we are mindful that the jury heard and saw the State's evidence in grim detail. The horrific nature of this crime largely drives our prejudice analysis.

Even viewed cumulatively, the jury was left with no evidence that could explain the shocking and unexpected nature of the attack against Viivi. There was no indication of alcohol or drug use, and no evidence of any mental health diagnosis that sometimes explains a sudden outburst and act of violence. Given the strong evidence that Waidla was angry with Viivi, planned the attack, and waited with a hatchet for Viivi to enter her home, it is hard to see how a jury could view Viivi's murder as a "momentary assaultive outburst."

Our task is limited to determining whether fairminded jurists could disagree that Waidla was prejudiced by his counsel's failure to present any of this mitigating evidence. *See Richter*, 562 U.S. at 102 (recognizing that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable"); *see also Pinholster*, 563 U.S. at 202 (observing that the unpresented mitigating evidence was "not so significant" that "it was necessarily unreasonable for the California Supreme Court to conclude that Pinholster had failed to show a 'substantial' likelihood of a different sentence" (citation omitted)). Because the California Supreme Court's denial of this claim was not objectively unreasonable, we reverse the district court's order granting relief on this claim. *See* 28 U.S.C. § 2254(d).

B

As an alternative ground for affirming the district court's order granting penalty-phase relief, Waidla argues that the prosecutor violated his Eighth Amendment right to heightened reliability in capital sentencing by presenting inconsistent factual theories at the seriatim trials of Waidla and Sakarias.

Under the Eighth Amendment, a capital sentencing determination requires a greater degree of scrutiny than other punishments. *See Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985); *Zant v. Stephens*, 462 U.S. 862, 884–85 (1983) ("[B]ecause there is a qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.'") (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). To prevail on his Eighth Amendment claim, Waidla must show that the Supreme Court has previously decided the constitutional question at issue and established the "precise contours" of the rule he invokes. *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003); *see Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." (internal quotation marks omitted)). When the Supreme Court has not provided a clear answer to the question presented, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam) (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006)).

In support of his Eighth Amendment claim, Waidla cites to *Woodson v. North Carolina*, 428 U.S. 280 (1976), and *Beck v. Alabama*, 447 U.S. 625 (1980). Neither case clearly established that it is unconstitutional for a prosecutor to present inconsistent theories under the Eighth Amendment. *Woodson* held that a mandatory death penalty scheme violated the Eighth Amendment. 428 U.S. at 304. *Beck* held that a death sentence could not be imposed when the evidence could support a lesser-included offense and the jury was not instructed on the lesser-included offense. 447 U.S. at 638. Waidla has not shown that the California Supreme Court's denial of his Eighth Amendment claim was contrary to or an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

Waidla also argued, in the district court and on appeal, that prosecutorial misconduct denied him his right to due process and a fair trial in violation of the Fourteenth Amendment.[9] The district court correctly observed that there is no clearly established Supreme Court precedent prohibiting a prosecutor from presenting inconsistent theories to convict codefendants in separate trials. *See Bradshaw v. Stumpf*, 545 U.S. 175, 190 (2005) (Thomas, J., concurring) (noting that the Supreme Court "has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories").

The California Supreme Court concluded that any false attribution to Waidla of hatchet blows inflicted by Sakarias was harmless. *In re Sakarias*, 106 P.3d at 950–51. And the district court concluded that Waidla's prosecutorial

---

[9] The district court considered Waidla's prosecutorial misconduct claim as a guilt-phase claim.

misconduct argument did not satisfy § 2254(d)(2) because
the California Supreme Court's factual findings that Waidla:
(1) inflicted the first hatchet blow when Viivi entered her
home; (2) likely delivered the other chopping blows in the
entryway; and (3) that Viivi died in the living room, were
supported by the evidence presented in state court and were
therefore reasonable.   Whether we consider the alleged
prosecutorial misconduct under the Eighth Amendment or
the Fourteenth Amendment, we agree that the claim fails
because the California Supreme Court's factual findings
were not unreasonable.

Waidla argues that the California Supreme Court
unreasonably determined that he was the actual killer and
struck the "fatal blow."   *See* 28 U.S.C. § 2254(d)(2).   He
argues that the court ignored the following facts to reach this
conclusion: (1) Waidla's confession was that "he only struck
one blow, with the blunt part of the hatchet"; (2) Sakarias
confessed to moving Viivi to the bedroom and "kill[ing] her
with the sharp edge of the hatchet"; (3) the blood spatters in
the bedroom showed that Viivi was alive when she was
moved to the bedroom and Sakarias was the only attacker in
the bedroom; and (4) Sakarias stabbed Viivi four times in the
chest and two of those stabbings were potentially fatal.

To grant habeas relief on a claim of trial error, we assess
the error for "actual prejudice" under *Brecht v. Abrahamson*,
which requires the error to have "had [a] substantial and
injurious effect or influence in determining the jury's
verdict."   507 U.S. 619, 623 (1993) (quoting *Kotteakos v.
United States*, 328 U.S. 750, 776 (1946)).

Waidla cannot meet this burden.   To begin, the first two
of Waidla's contentions misinterpret the record: the
California Supreme Court recounted that Waidla admitted

striking Viivi once but denied "any memory of how the rest of the attack proceeded," and the court observed that, after the initial attack, the evidence showed that "at Waidla's direction, [Sakarias] went to the bedroom and chopped Viivi's head twice with the hatchet." *In re Sakarias*, 106 P.3d at 936; *People v. Sakarias*, 995 P.2d 152, 161–62 (Cal. 2000) (summarizing Sakarias's confession).

The court expressly considered Waidla's latter two contentions, acknowledged that both men participated in the "fatal attack" against Viivi, and that Dr. Ribe found the cause of death to be from a combination of wounds. *In re Sakarias*, 106 P.3d at 934–36. In reviewing the evidence from both trials as well as the evidentiary hearing held at the postconviction stage, the California Supreme Court reasonably concluded that "the great weight of the evidence available—the statements of both petitioners, the physical crime scene evidence, and the medical examiner's expert testimony—tended to show that Waidla wielded the hatchet in the initial attack, that the first chopping wound was inflicted before Viivi's death, and that Viivi died in her living room from the initial attack before being dragged to the back bedroom." *Id.* at 950. Given the impact of the evidence showing that Waidla waited for Viivi to enter through the front door, the large pool of blood in the living room, Waidla's confession that he was the first to strike her in the head with the blunt end of the hatchet, and the absence of evidence that Waidla and Sakarias exchanged weapons in the initial attack, *see id.* at 948, we cannot say that the California Supreme Court unreasonably concluded that the prosecutor's false attribution of all three chopping wounds to Waidla was not prejudicial. The prosecutor's attribution to Waidla of all three hatchet blows inflicted in the entryway does not leave us with "grave doubt" about whether any false

attribution had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Davis v. Ayala*, 576 U.S. 257, 268 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

Whether considered as a penalty-phase Eighth Amendment claim or a guilt-phase due process claim, Waidla has not shown he is entitled to relief based on prosecutorial misconduct.

**AFFIRMED in part and REVERSED in part.**

---

CHRISTEN, Circuit Judge, concurring:

Though I conclude that the California Supreme Court's prejudice analysis was not unreasonable, I also conclude that some aspects of Waidla's counsel's performance fell below an objectively reasonable standard. I write separately to avoid minimizing the requirement that counsel investigate a capital defendant's available options before deciding not to pursue them. In doing so, I acknowledge that the burden of defending a capital case is extraordinary.

The applicable ABA practice guidelines stated that counsel's investigation relating to the penalty phase of a capital trial "should begin immediately upon counsel's entry into the case and should be pursued expeditiously." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(A) (1989) (hereinafter ABA Guidelines). *Strickland* requires that we view counsel's performance with latitude that accounts for "the wide range of reasonable professional assistance," *see Strickland v. Washington*, 466 U.S. 668, 689–90 (1984) (noting that strategic decisions are "virtually unchallengeable" if made

"after thorough investigation of law and facts[.]"). Hindsight makes it easy for others to second-guess difficult decisions that lawyers must make under circumstances that are far from ideal. And for the reasons explained in the majority opinion, my view is that Waidla did not suffer prejudice as a result of his lawyer's performance. But the need to prepare sentencing-phase mitigation evidence was apparent from the outset of this case because the defense knew that Waidla had confessed to committing an exceptionally gruesome murder of a woman who had taken him in as a refugee and supported him for over a year.

The evidence and circumstances in many murder cases permit counsel to argue that a sudden, violent attack was the product of mental illness, drugs, or alcohol. The facts in this case were terribly difficult to defend because they included strong evidence that the crime was both premediated[1] and brutal.[2] Counsel could not control when the trial court ruled on the motion to suppress Waidla's pretrial statements, but counsel knew the risk that the pretrial statements and Waidla's confession could be admitted, and the State's case against Waidla was strong even without the pretrial statements. As such, it was critical that the defense muster reasonably available mitigation evidence to be prepared to

---

[1] In addition to the evidence that Waidla waited for Viivi inside her home on the day of the murder, the State offered a letter Waidla wrote to Sakarias in May of 1988 in which he stated that they had to "get rid of those dammed Estonians for once finally."

[2] The California Supreme Court described in detail how Waidla and Sakarias "*throttled* [Viivi]," "*bludgeoned* her . . . delivering some blows with such force as to crush her skull," "*chopped* her three times around the top of her head[,]" and "*stabbed* her four times[.]" *People v. Waidla*, 996 P.2d 46, 57 (Cal. 2000) (emphasis in original).

offer the most robust possible response to the prosecution's strong aggravating evidence.  ABA Guidelines 11.4.1(C).

The district court did not fault the decision to forgo a mental state defense, and neither do I.  The pretrial psychological assessments did not suggest that Waida's actions could be explained in whole or in part by a mental health diagnosis.  More favorable assessments were offered at the postconviction stage, but as the district court recognized, they were offered by witnesses who were far from well-versed about the circumstances in which this murder occurred.

That said, I agree with our dissenting colleague that more should have been done to explore available mitigation evidence regarding Waidla's background and upbringing in Estonia.  Waidla's concern for the safety of Estonian witnesses appears to have been both legitimate and genuinely held, but the record establishes that counsel "did not definitively resolve the issue" with Waidla, and counsel's decisions can only be deemed "strategic" if they were made after an adequate investigation.  *Strickland*, 466 U.S. at 690–91; *Correll v. Ryan*, 539 F.3d 938, 948 (9th Cir. 2008).

The evidence that could have been uncovered does not show the type of extreme child abuse or neglect that has been found to be sufficiently mitigating in other cases, *see Williams v. Taylor*, 529 U.S. 362, 395 (2000); and it was not entirely one-sided.  But I see no reasonable dispute that it would have humanized Waidla to explain his difficult upbringing in greater detail.  More to the point, *Strickland*'s deficient performance prong required counsel to explore this possibility and explain the consequences of not doing so.

The State relies on *Burger v. Kemp*, 483 U.S. 776 (1987) and *Strickland*, but those cases are easily distinguished. In *Burger*, counsel interviewed all potential witnesses who had been called to his attention and reasonably decided against a mitigation strategy that required testimony from the defendant. *Burger*, 483 U.S. at 794–95. That decision was strategic because a psychologist had warned that the defendant might brag about the crime on the witness stand. *Id.* at 791–92. In *Strickland*, the defendant's character and psychological evidence would have held little weight in light of the overwhelming aggravating circumstances, and the court found that counsel acted strategically to ensure evidence of his client's character, criminal history, and psychology would not be admitted. *Strickland*, 466 U.S. at 699.

Here, counsel did not interview any potential witnesses from Estonia or conduct an investigation to discover what evidence might be available. Unlike counsel in *Burger*, there was no reasonable basis for counsel to conclude that additional evidence concerning Waidla's personal history would be counterproductive. Waidla had no criminal history and the record does not show that there were other episodes in his past that counsel purposefully side-stepped. To the contrary, the evidence shows that despite initial hardships in his childhood, Waidla was well-liked by his peers in Estonia, performed reasonably well in school and in sports, and did not exhibit anti-social or violent behavior.

Separately, the defense was aware that there had been no disciplinary proceedings against Waidla while he awaited trial, but counsel did not pursue Waidla's good behavior as potential mitigation evidence. In addition to having an infraction-free record during that initial period of incarceration, Waidla's declaration stated that he obtained a

job working in the prison's kitchen and that he was given a different-colored uniform and a pass that allowed him to leave his cell and go to work. He was also one of few inmates allowed to read in the library. A memo to the district attorney corroborates Waidla's declaration, noting that unlike Sakarias, Waidla did not face disciplinary action during the first several months of his confinement. The record does not suggest a strategic reason for failing to investigate and present this admissible, mitigating evidence of Waidla's adjustment to incarceration.

Finally, I agree that counsel's failure to present evidence of Waidla's mistreatment in the Soviet Army was unreasonable. The State admitted Waidla's article, but defense counsel failed to present evidence explaining the hostility between Estonian and Russian soldiers and the specific conditions that Waidla experienced. Avo provided some testimony regarding the mistreatment that Estonian soldiers faced, but he did not testify about the practices in effect during Waidla's service. According to Dr. Ruumet, it was widely recognized that Estonian conscripts were abused, and units with more Russian soldiers, like the one Waidla ended up in, were especially dangerous. Evidence offered at the state post-conviction stage included Dr. Ruumet's explanation that Waidla feared he would die in the military, and that in one letter he sent to his family, "he pleaded with them to try to save him." Without this context, the jury could have failed to appreciate the extent of the hardships described in Waidla's article. I am unpersuaded by the State's argument that elaborating upon the article would have been entirely cumulative.

Mustering a successful counterweight to Waidla's violent crime would have been an uphill battle under any circumstances, but in my view, despite the deference we

afford to counsel's strategic choices, the failure to investigate these avenues and present this mitigation evidence fell below an objective standard of reasonableness.

---

WARDLAW, Circuit Judge, dissenting in part:

Consistent with our opinion issued May 23, 2023, I concur in that portion of the judgment denying habeas relief from Waidla's conviction, although I do not join the majority's opinion. However, I continue to believe that counsel performed deficiently during the penalty phase and that this deficient performance prejudiced Waidla. Therefore, I would affirm the district court's grant of habeas relief to Waidla on his penalty phase ineffective assistance of counsel claim.

To be clear, Waidla committed a heinous and gruesome crime that deserves punishment. Under our system, however, "[c]apital defendants have a constitutional right to the effective assistance of counsel at the guilt and penalty phases of trial." *Avena v. Chappell*, 932 F.3d 1237, 1247 (9th Cir. 2019); *see Strickland v. Washington*, 466 U.S. 668 (1984). This need for effective counsel is especially acute where, as here, the deficient performance is the difference between life and death. *Cf. Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) ("Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate

punishment in a specific case."). Therefore, with respect, I dissent from the majority's opinion.[1]

### A.

### Legal Standard

Waidla's sole claim of error at the penalty phase is that his counsel rendered ineffective assistance by failing to investigate and present mitigation evidence that competent counsel would have discovered. *Strickland v. Washington*, 466 U.S. 668 (1984), sets out the standard for ineffective assistance of counsel claims. Under *Strickland*, Waidla must first show that his counsel's performance "fell below an objective standard of reasonableness" under prevailing professional norms. *Id.* at 688. *Strickland* creates a strong presumption that counsel's performance "falls within the wide range of reasonable professional assistance." *Id*. at 689. Counsel's strategic decisions, if "made after thorough investigation of law and facts," are "virtually unchallengeable." *Id.* at 690. Our court assesses a particular decision not to investigate or to limit the scope of investigation for reasonableness. *Id.* at 691.

If Waidla can show that counsel's performance was deficient, he must then establish prejudice. *Id.* at 694. To assess prejudice at the penalty phase, we reweigh all of the evidence in aggravation and mitigation and ask whether, had counsel provided competent representation, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003); *see also id*. at 534, 536.

---

[1] The following discussion is drawn largely from the original per curiam opinion.

When 28 U.S.C. § 2254(d) applies, we defer to a state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  When reviewing a state court decision for which there is no reasoned opinion, as here, we must consider any arguments that could have supported the state court's decision. *See Harrington v. Richter*, 562 U.S. 86, 102 (2011).  We may grant Waidla habeas relief only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.*

I would hold that the California Supreme Court unreasonably applied *Strickland*'s standard in evaluating Waidla's claim of ineffective assistance at the penalty phase. Had the three categories of evidence that counsel should have discovered been presented to the jury, there is a reasonable probability that at least one juror would have voted against the death penalty.

## B.

### The Admitted Inadequacy of Counsel's Investigation

Counsel admitted that he conducted no investigation into mitigation evidence beyond any incidental investigation he made of evidence relevant to the guilt phase.  Competent counsel would have sought out and introduced evidence concerning Waidla's background and character, the hardship Estonians faced in the Soviet Army, and Waidla's good behavior while in custody awaiting trial.  Counsel's disregard for all three possible mitigation strategies makes

clear that his incompetence is "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

*Background and Character Evidence.* The record shows that counsel "abandoned [his] investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources," thereby violating basic professional standards. *Wiggins*, 539 U.S. at 524; *see also Apelt v. Ryan*, 878 F.3d 800, 831 (9th Cir. 2017) ("There can be no doubt that counsel was required to review a defendant's background in preparation for sentencing."). The duty to investigate a defendant's social history was as foundational at the time of trial as it is now. Practice guidelines in effect in 1990, which guide our analysis of what qualifies as reasonable professional conduct, *Strickland*, 466 U.S. at 688, stated that "[c]ounsel in a capital case is obligated to conduct a thorough investigation of the defendant's life history and background." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 8.1, commentary (1989). Abdicating this duty, counsel interviewed Waidla alone and did not procure any psychological or psychosocial evaluations.

Waidla's resistance to having counsel perform a social history investigation did not eliminate counsel's duty to investigate his background. To be sure, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant." *Strickland*, 466 U.S. at 691. But counsel "never made a serious attempt to educate [Waidla] about the consequences of his decision." *Silva v. Woodford*, 279 F.3d 825, 841 (9th Cir. 2002). Although Waidla's concern for the safety of Estonian witnesses was legitimate and genuinely held, that concern was only part of the calculus. Counsel himself admitted that, far from fully

advising Waidla on the benefits and drawbacks of an investigation, he "did not definitively resolve the issue" with Waidla. In fact, Waidla realized that one basis for his reluctance to have counsel contact witnesses in Estonia was unreasonable, showing that he continued to actively consider the issue. Failing to advise Waidla of the importance of mitigation evidence was especially detrimental because, as Waidla stated in his declaration, he "did not have an understanding of the American legal system [and] did not know what would constitute a presentation of 'mitigation' evidence."

The State's comparisons to the investigations held competent in *Strickland* and *Burger v. Kemp*, 483 U.S. 776 (1987), are unconvincing. Counsel in both cases made an informed strategic decision to limit their social history investigations because they knew that presenting social history evidence would prove harmful. In *Strickland*, counsel sought to avoid opening the door to evidence of the defendant's criminal history, bad character, and intact psyche. *See* 466 U.S. at 672–74, 699. In *Burger*, counsel sought to keep the defendant's criminal history from the jury, as well as testimony from family and acquaintances about his drug use and violent tendencies. 483 U.S. at 791–95. Counsel also reasonably decided against a mitigation strategy that required testimony from the defendant, who showed a lack of remorse and, according to a psychologist, might have bragged about the crime on the witness stand. *Id.*

No such concerns are evident in this case. Waidla had no criminal history and his social history would not have revealed any significant prior bad acts. Further, no psychological expert identified him as a liability on the stand and he expressed deep remorse for Viivi's murder. Thus, *Strickland* and *Burger* are not instructive on this point.

Finally, although counsel would have faced logistical hurdles to investigating abroad, those challenges did not eliminate counsel's duty to investigate. In *Apelt*, a case governed by 28 U.S.C. § 2254(d), we considered whether counsel had performed deficiently in representing a capital defendant who had lived in Germany until six months before the crime. 878 F.3d at 805, 830–31. Since counsel was aware that a social history investigation could have revealed useful mitigation evidence, we held that he had rendered ineffective assistance because his co-counsel made only one trip to Germany and was unable to communicate with the defendant's German-speaking family while there. *Id.* As in *Apelt*, Waidla's counsel was on notice of the need for a social history investigation. He knew that Waidla's upbringing was not traditional in that Waidla had not been raised by his parents. That counsel broached the question of investigating in Estonia with Waidla multiple times shows that he was aware of the significance of a social history investigation. Yet, as in *Apelt*, counsel fell short of professional standards by abandoning his efforts to investigate through travel to Estonia or other means. *Id.*

Moreover, the record shows that investigating in Estonia, while more challenging than a domestic investigation, would not have been the "daunting task" the State claims. In 1989 and 1990, communication between the United States and Estonia was possible via fax, phone, and mail. Dr. Ruumet reports that by June 1990, "the Soviet regime had loosened enough to allow relatively unfettered travel in and out of the country." And although a personal visit by counsel to Estonia may have been possible, counsel need not have personally traveled to Estonia, as Professor Pork would have interviewed Waidla's family and acquaintances on counsel's behalf. Because California provides indigent defendants

with funding for efforts "reasonably necessary for the preparation or presentation of the defense" upon an application by counsel, Cal. Penal Code § 987.9(a), the costs of international investigation were not insurmountable. Notably, counsel in co-defendant Sakarias's trial, which occurred within a year of Waidla's trial, was able to obtain social history interviews from Sakarias's family and friends in Estonia. *In re Sakarias*, 106 P.3d at 936, 949. Thus, counsel's violation of minimum professional standards was not excused by logistical barriers.

*Mistreatment in the Soviet Army.* Counsel's duty to investigate a defendant's social history no doubt includes an obligation to seek out evidence of childhood hardship because "[e]vidence of abuse inflicted as a child is especially mitigating." *Andrews v. Davis*, 944 F.3d 1092, 1117 (9th Cir. 2019) (en banc).

Waidla was still a teenager when he was conscripted into the Soviet Army. *People v. Waidla*, 996 P.2d 46, 54 (Cal. 2000). Counsel was aware of this chapter in Waidla's life because Waidla's article, *Escaping Through the Fog*, detailed the experience to an extent. Yet counsel did not argue that Waidla's hardships were relevant to the jury's decision, nor did he attempt to obtain additional contextual evidence about the indignities visited on Estonian conscripts in the Soviet Army.

Had counsel investigated, he would have found that in addition to the crowded lodging, repeated exposure to bitter cold, and inadequate medical care described in Waidla's article, Estonian soldiers often encountered serious physical abuse and even death at the hands of Russian soldiers and officers. Counsel would have learned of the psychological impact that looming danger had on Waidla, whose letter to

his family begging for help spoke to his despondency and fear. Armed with this evidence, competent counsel would have argued that Waidla's time in an abusive institutional setting detracted from his culpability.

The State makes much of the fact that the jury had access to some evidence about Waidla's time in the Soviet Army. The article, *Escaping Through the Fog*, was introduced during the guilt phase and in his testimony, and Avo indicated he agreed with the statement that "traditionally draftees from the Baltic States were not treated very well in the Soviet Army." According to the State, the jury's awareness of this evidence eliminated any need for counsel to investigate cumulative evidence concerning the abuse endured by Estonian soldiers. I disagree. The State improperly emphasizes the mere existence of evidence in the record while disregarding counsel's obligation to explain how that evidence should be factored into a decision of whether to impose the death penalty. The State also overstates the cumulative nature of the postconviction evidence.

First, counsel's obligations do not end at ensuring that mitigation evidence is accessible to the jury. That is all that counsel did with respect to Waidla's time in the Soviet Army. Avo's testimony did not make an appearance in counsel's guilt or penalty phase arguments. Counsel also never argued at the penalty phase that Waidla's article evidenced hardship that ought to inform the jury's sentencing decision. Nor did this evidence feature in the State's case in a way that would alert the jury to its mitigating force. The State referenced the article for its discussion of Waidla's escape from the Soviet Army, not its description of his experiences prior to escape. It was incumbent on counsel not just to make sure that this

mitigation evidence made it to the jury, but to identify its existence and to argue its relevance. *See Rogers v. Dzurenda*, 25 F.4th 1171, 1189 (9th Cir. 2022) (finding deficient performance when counsel's opening statement gave the jury "inadequate context for how the evidence would relate to the insanity defense"). Counsel failed to fulfill that aspect of his professional duty.

Perhaps the glaring omission of the argument that Waidla's mistreatment in the Soviet Army reduced his culpability could be excused as a strategic decision. Such strategic decisions, when reasonably well-informed, are entitled to deference. *Strickland*, 466 U.S. at 690. But even if there was a hypothetical strategic purpose for leaving this mitigation evidence unmentioned, counsel did not make a decision with the benefit of all of the evidence at his disposal. After proper investigation, counsel could have made a significantly more forceful version of the argument that Waidla was mistreated in the Soviet Army, as discussed below. Thus, any strategic decision was fatally underinformed.

Nor could a fairminded jurist conclude that it was reasonable to eschew further investigation on the theory that only cumulative evidence could be obtained. Waidla's article only vaguely references the hostility between Estonian and Russian soldiers and does not adequately convey the extent of the power disparity favoring the Russians. Avo attested to the power imbalance to some extent, but provided no detail about the nature of the abuse, nor did he testify about the practices in effect during Waidla's service. This evidence left a significant gap in explaining the severity of the likely abuse as well as its systemic nature.

*Bobby v. Van Hook*, 558 U.S. 4 (2009), on which the
State relies, is inapposite.  There, because counsel had
gathered significant evidence of the defendant's abusive
family life, he was reasonable to forego obtaining additional,
likely cumulative, testimony on that topic from more distant
relatives. *Id.* at 10–12.  In contrast, it should have been clear
to Waidla's counsel that he could have sought out evidence
not just corroborating Waidla's article but providing much-
needed context for it.

The State's contention that "cumulative evidence that
other soldiers were also mistreated lacked any real
significance, especially if Waidla was not aware of the
circumstances" is unpersuasive.  First, according to Dr.
Ruumet, the risks to Estonian conscripts were so widely
known that Estonians frequently took measures to avoid
placement in units with more Russian soldiers, like the one
Waidla ended up in, which were especially dangerous.  Thus,
Waidla surely understood the scope of the danger that
awaited him.

Second, it is highly relevant that Estonian soldiers were
subjected to widespread, state-sanctioned abuse rooted in
prejudice.  Without that context, the jury could have
misinterpreted Waidla's account of harsh training tactics and
fights between Estonian soldiers and their Russian
counterparts as commonplace drills and roughhousing rather
than sanctioned institutional abuse.  The information
provided by Dr. Ruumet would have also supported an
argument that Waidla did not just endure run-of-the-mill
discomforts while serving, but also suffered significant fear
and emotional distress, as shown by Waidla's desperate
letter to family requesting that, as Dr. Ruumet paraphrased,
they "try to save him."  Because context was so crucial to
understanding Waidla's experience, counsel could not have

reasonably forgone investigation into this mitigation strategy simply because the jury had access to Waidla's account.

*Good Behavior in Custody Awaiting Trial.* It is well established that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986); *see also Williams v. Taylor*, 529 U.S. 362, 396 (2000) (failure to present, *inter alia*, prison guard testimony that defendant was not dangerous or violent as well as prison records demonstrating good behavior contributed to finding of deficient performance). The import of such mitigating evidence is particularly clear when the State argues for the death penalty on the ground that a defendant "could not be trusted to behave if he were simply returned to prison." *Skipper*, 476 U.S. at 5 n.1. Here, the State made a similar argument by telling the jury that Waidla had a "violent nature" and that killing meant nothing to him.

Counsel was on notice that, contrasting with the State's narrative that Waidla posed a risk of future violence, Waidla had not encountered any disciplinary issues while incarcerated pending trial. Yet counsel ignored this "tantalizing indication[] in the record," *Stankewitz v. Woodford*, 365 F.3d 706, 720 (9th Cir. 2004), of a possible mitigation strategy based at least in part on Waidla's good behavior. Counsel's failure to pursue this viable strategy was unreasonable. Each of the State's arguments to the contrary is unpersuasive.

First, the California Supreme Court could not reasonably have found counsel's performance adequate by disregarding Waidla's evidence as inadmissible or conclusory. To make out a prima facie case in a California habeas petition, a

petitioner must attach "reasonably available" documentation supporting his allegations. *People v. Duvall*, 886 P.2d 1252, 1258 (Cal. 1995). A petitioner may not rely on hearsay evidence to make out a prima facie case, *People v. Madaris*, 122 Cal. App. 3d 234, 241–42 (1981), *overruled on other grounds by People v. Barrick*, 654 P.2d 1243, 1250 (Cal. 1982), nor on "subjective, self-serving" statements, *In re Alvernaz*, 830 P.2d 747, 756–57 (Cal. 1992). Looking to this procedure, the State argues that the California Supreme Court could have declined to consider the CDC document noting that Waidla behaved well in county jail as hearsay and could have found Waidla's remaining evidence conclusory.

Fairminded jurists would agree that Waidla offered enough admissible evidence to show that counsel rendered ineffective assistance. That is true even assuming the CDC document is inadmissible hearsay. Waidla's declaration explaining the privileges he accrued in county jail for good behavior may be self-serving, but it is hardly conclusory. The declaration explains, based on Waidla's personal knowledge, that he enjoyed freedoms reserved for well-behaved prisoners like the ability to read in the library and the ability to leave the dormitories for his job. That evidence is more than a bare allegation of good behavior. *See SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (differentiating self-serving declarations from conclusory ones that offer no admissible facts).

Waidla's declaration, which speaks to three months of his confinement, is corroborated by other evidence. The memorandum authored by the District Attorney's office in 1989 evaluated whether the death penalty was appropriate for Waidla and Sakarias. The memo recommends seeking the death penalty for Sakarias but not Waidla in part because Waidla, unlike Sakarias, did not face disciplinary action

during the first several months of his confinement, and he did not "evidence the same degree of danger to society" as Sakarias did. The State does not argue that the DA memo is inadmissible hearsay, and our court has previously considered the State's decision to seek or not seek the death penalty against a co-defendant in this context. *See Sanders v. Davis*, 23 F.4th 966, 994 (9th Cir. 2022). The declaration is also corroborated by Waidla's lack of criminal history and Dr. Young's opinion concerning his nonviolent personality structure. Waidla's evidence is, therefore, far from conclusory.[2]

Second, the State argues that the California Supreme Court properly denied this subclaim because counsel's declaration "sheds no light on Waidla's behavior while in custody or trial counsel's decisions concerning such behavior." Not so. Counsel was aware that "there were no disciplinary proceedings against Mr. Waidla." True, he gave no explanation for his failure to investigate the matter, but he admitted that he conducted no investigation whatsoever. It is therefore clear that his decision not to pursue this strategy did not stem from strategic insight gained after

---

[2] Typically, upon finding that a state court decision violated 28 U.S.C. § 2254(d), the federal habeas court undertakes *de novo* review of the claim before granting relief. *See Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008) (en banc). The district court did not explicitly conduct *de novo* review. On appeal, the State takes issue only with the district court's § 2254(d) analysis. Accordingly, the State has forfeited any objection that the district court erred by granting relief based on the evidence submitted in support of Waidla's petition rather than evidence adduced in a new evidentiary hearing. To the extent the State makes an argument limited to this subclaim that the district court should have required *admissible* evidence of Waidla's good behavior before granting relief, that argument is unavailing because Waidla's evidence apart from the CDC document could have been rendered in admissible form.

additional investigation.  The State cites no authority for the proposition that trial counsel must affirmatively state that he lacked a strategic purpose, nor should the court adopt that rule here.

Moreover, the record does not reveal any discernable strategy that might have justified counsel's inaction.  Any suggestion that counsel could reasonably have decided against investigating on the theory that juries are usually unpersuaded by good behavior evidence is untenable.  It would be difficult to reconcile that view with *Skipper*'s holding that good behavior evidence must be admitted as mitigation, *see* 476 U.S. at 5, let alone *Williams*'s holding that counsel was deficient in part for not gathering such evidence, 529 U.S. at 396.  *See also Deck v. Missouri*, 544 U.S. 622, 633 (2005) (noting that whether the defendant is "a danger to the community" is "nearly always a relevant factor in jury decisionmaking, even where the State does not specifically argue the point").

Finally, the State contends that presenting good behavior evidence could have indicated to the jury that no better mitigation evidence was available.  But had counsel conducted an adequate investigation, Waidla's good behavior in custody while awaiting trial would not have stood alone in Waidla's mitigation case.  It would have stood alongside and complemented the other evidence counsel could have introduced as described above.  Thus, counsel's failure did not stem from a reasonable strategic judgment, but from an oversight that cannot be squared with even *Strickland*'s forgiving standard.

## C.

## Prejudice

Because counsel performed deficiently by failing to introduce and argue several categories of mitigation evidence, it is necessary to address whether counsel's incompetence prejudiced Waidla.  To do so, courts reweigh the aggravation evidence against the mitigation evidence that ought to have been presented to the jury.  *Wiggins*, 539 U.S. at 534.

One factor relevant to assessing whether a reasonable probability exists that one juror would have voted differently is the jury's behavior at trial.  Long deliberations relative to the complexity of the case and indications of close jury deliberations "weigh against a finding of harmless error because [they] suggest a difficult case."  *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc) (internal quotation marks and citation omitted); *Noguera v. Davis*, 5 F.4th 1020, 1045 (9th Cir. 2021).[3]  We also consider the strength of the aggravation evidence and the nature and quality of the mitigation evidence originally

---

[3] The State contends otherwise.  In its view, lengthy jury deliberations do not necessarily signify jury indecision.  But the jury notes indicating deadlock gave a clear picture about the reason for its long deliberations. The State also hypothesizes that the jury's deadlock could have been unrelated to the balance of mitigation and aggravation evidence and instead caused by, for instance, a juror's misunderstanding of an instruction.  But jury questions indicating deadlock show that the death sentence "was not a foregone conclusion, especially given that the jurors' only task at that point was to decide between a sentence of life without parole and death."  *Silva*, 279 F.3d at 849–50.  Even if the jury had been preoccupied with a mitigation factor unrelated to Waidla's background or character, evidence relevant to those factors could have moved an uncertain jury to weigh the totality of the circumstances differently.

presented in comparison to the nature and quality of the new mitigation evidence. *See Wiggins*, 539 U.S. at 537–38.

With these factors in mind, the California Supreme Court could not reasonably have found that counsel's failures were non-prejudicial. The jury delivered a death sentence knowing very little about Waidla's background and positive qualities. Even so, it took the jury nine days of deliberation and two bouts of deadlock to reach a verdict. Indeed, a declaration of one of the jurors on Waidla's jury explains that the jury was "looking for reasons to show mercy if possible," and that the "penalty phase deliberations were very intense." Yet, because Waidla's counsel did not put on a case, the jury had nothing to seize upon in order to grant Waidla mercy. No fairminded jurist considering a jury so closely divided could discount the prejudicial effect of failing to present even modest evidence of Waidla's background and good character. *See Wharton v. Chappell*, 765 F.3d 953, 978 (9th Cir. 2014) ("The jury's notes and the fact that it deliberated over the course of three days suggest that the verdict was not an easy one to reach"); *Kipp v. Davis*, 971 F.3d 939, 959 (9th Cir. 2020) (three-day deliberation supported a finding of prejudice); *Thomas v. Chappell*, 678 F.3d 1086, 1103 (9th Cir. 2012) (five-day deliberation with several readbacks supported a finding of prejudice) (collecting cases).

The difference between the mitigation evidence actually presented and the evidence that competent counsel would have presented is significant. As the background evidence the jury heard was scant, it can readily be recounted again here: Waidla was born in Estonia, a country then occupied by the Soviet Union, and was raised by family members other than his parents. He testified that he had two encounters with the KGB as a teen in which he was detained

and beaten for allegedly protesting against the Soviet Union. At age 18, he was conscripted into the Soviet Army, where Estonians were generally not treated well. If the jury in fact read *Escaping Through the Fog*, which is not clear from the record, it would have learned that Waidla experienced harsh living conditions and once fled from a brawl between Russian and Estonian soldiers, before falling ill and ultimately escaping. While living with the Piirisilds, Waidla was typically friendly and demonstrated his construction skills by completing several home improvement projects. He was just 20 at the time of the crime and had committed no prior felonies. Finally, Waidla cooperated with law enforcement after his arrest.

Waidla's mitigation case at trial essentially amounted to an incomplete picture of the adversity he faced in the Soviet Army, his age, and his lack of criminal history. The sparseness of this evidence is akin to counsel's presentation in *Wiggins*, where the "sentencing jury heard only one significant mitigating factor—that Wiggins had no prior convictions," 539 U.S. at 537, as well as that in *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam), where the mitigation case consisted of "inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son," *id.* at 32.

If Waidla had been competently represented, the jury would have heard much more. To start, competent counsel would have made the jury aware of Waidla's many positive character traits. One such trait was Waidla's strong work ethic. Waidla worked hard at marksmanship as a teen, showing dedication and skill that surpassed his peers. He also excelled in photography, having worked under the tutelage of his great-uncle Gunnar to learn the proper techniques. In jail pending trial, Waidla worked

maintenance and kitchen duty jobs, which entailed physical labor like buffing floors. He spent free time in the library strengthening his English and reading newspapers.

Waidla's consistent dedication to his pursuits could have undercut the State's portrayal of Waidla as entitled and parasitic. Counsel would have also directly refuted the State's contention that Waidla was lazy by referring to the testimony from Dr. Ruumet, who opined that Waidla's perceived laziness was possibly attributable to depression brought on by "circumstances in which he had lost his whole support system and in which he felt helpless and overwhelmed." Dr. Ruumet's analysis was in line with Dr. Young's assessment, based on psychological testing, that "depression is an underlying component of Waidla's character."

Another character trait of note was Waidla's pro-social nature and his "characterological aversion to confrontation and violence." Loved ones, acquaintances, and coaches all attested to Waidla's distaste for conflict and his peaceable disposition. Dr. Young opined that Waidla was the least violence-prone prisoner she had ever evaluated in the context of criminal proceedings. This testimony would have complemented and added credibility to evidence counsel could have presented of Waidla's compliant and nonviolent behavior while in jail awaiting trial. There, guards and a librarian afforded him special privileges that would not have been fitting for a dangerous prisoner. The State suggests that evidence of Waidla's good behavior in jail would not influence jurors who knew that he carried a loaded gun and a threatening note at the time of his arrest. However, that assessment disregards the character evidence that likewise points to his peaceful nature.

Evidence of Waidla's lack of future dangerousness would have undermined the State's contention that Waidla had a "violent nature," and that "killing doesn't mean anything" to him. That much is clear from *Skipper*, in which the relevance of similar evidence was "underscored . . . by the prosecutor's closing argument, which urged the jury to return a sentence of death in part because petitioner could not be trusted to behave if he were simply returned to prison." 476 U.S. at 5 n.1.

Competent counsel would have introduced the evidence that Waidla was conscripted into the Soviet Army, where it was common knowledge that Estonians were targeted for serious physical and emotional abuse. Even if the jury took the time to review Waidla's article closely, which no one can be sure of, it would not have known the full extent of the possible danger to Waidla. Waidla's depiction of his experiences in the Soviet Army takes on new meaning when viewed in proper context, namely, a context of institutionalized and prejudice-based abuse that could prove fatal. The postconviction evidence therefore revealed the true nature of the psychological toll that conscription took on Waidla.

Finally, competent counsel would have presented the humanizing evidence about Waidla's strong bonds to family members, including his great-uncle Gunnar, whom Waidla idolized and, according to Gunnar, related to as "both mother and father." The jury would have learned that Waidla's connections to family enabled him to withstand the hardships of his early life. This evidence would have allowed the jury to view Waidla as a three-dimensional person with the ability to form meaningful connections, a stark contrast from the caricature of a callous murderer presented by the State. *See Porter*, 558 U.S. at 41 ("The

judge and jury . . . heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability.").

In sum, competent counsel would have rounded out the jury's understanding of Waidla's humanity and positive qualities.  At the same time, counsel would have marshalled the evidence to counter the State's arguments that Waidla was lazy, dangerous, and cruel.  Any confidence in the jury's verdict is undermined because "the task [the jury] actually undertook differed so profoundly from the one it would have performed had [Waidla's] counsel not been deficient." *Boyde v. Brown*, 404 F.3d 1159, 1180 (9th Cir. 2005), *as amended*, 421 F.3d 1154 (9th Cir. 2005).

Waidla's mild resistance to having counsel contact his loved ones and acquaintances in Estonia does not eliminate the prejudice associated with counsel's failure to do so, as in *Schriro v. Landrigan*, 550 U.S. 465 (2007).  "[W]e have held that the *Landrigan* prejudice holding does not apply when the defendant 'did not threaten to obstruct the presentation of any mitigating evidence.'"  *Sanders*, 23 F.4th at 981 (quoting *Hamilton v. Ayers*, 583 F.3d 1100, 1119 (9th Cir. 2009)).  *Landrigan* is not controlling in this case.

Waidla's reluctance pales in comparison to the opposition at issue in *Landrigan*.  There, Landrigan hamstrung any and all attempts by counsel to present a mitigation argument, including by interrupting during counsel's proffer of evidence to the judge and by asking the judge to impose the death penalty.  *Landrigan*, 550 U.S. at 470, 476–80.  By contrast, Waidla merely voiced concerns about conducting an investigation in Estonia in conversations with counsel.  He never indicated that he would obstruct counsel.  Additionally, counsel in *Landrigan*

advised his client strongly against his preferred course of action and attempted to present mitigation evidence over his client's objections. *Id.* at 479–80. Waidla received markedly less diligent representation, as counsel simply did not press the issue enough to reach resolution on it. In other words, *Landrigan* does not govern because the major gap in Waidla's mitigation case is attributable to counsel's actions rather than Waidla's.

The mitigation strategy outlined above is a modest one. Waidla's social history does not reveal facts that often support a finding of prejudice like abject abuse or serious mental incapacity. *See, e.g.*, *Williams*, 529 U.S. at 395–98. And, to be sure, good character evidence sometimes lacks persuasive force in the face of a "gr[isly] murder." *Bemore v. Chappell*, 788 F.3d 1151, 1172 (9th Cir. 2015). But crucially, the court must determine whether fairminded jurists could conclude that this mitigation evidence gives rise to a reasonable probability that at least one juror would have voted differently. Waidla meets that standard given the jury's deadlocking twice, its empty search for a reason to grant mercy, the extremely minimal mitigation evidence presented in the guilt phase, and the missed opportunity to rebut various aspects of the State's aggravation argument, which was itself modest. [4]

---

[4] Waidla argues, as an alternative ground for affirmance, that he was deprived of due process by the State's presentation of false evidence against him. Because penalty phase relief is warranted on Waidla's ineffective assistance of counsel claim, I do not address whether the state court's determination violated 28 U.S.C. § 2254(d).